1  Justin G. Reden, Bar No. 230068
   Collin E. Cresap, Bar No. 342752
2  REDEN | RIDDELL
   16885 Via Del Campo Court, Suite 320
3  San Diego, CA 92127
   Telephone: (619) 758-3869
4  Email: *jreden@redenriddell.com*
   Email: *ccresap@redenriddell.com*
5
   Attorneys for Plaintiffs: DYLAN ROBLES
6

7                **UNITED STATES DISTRICT COURT**

8              **SOUTHERN DISTRICT OF CALIFORNIA**

9                      **SAN DIEGO DIVISION**

10  DYLAN ROBLES, an individual,            ) Case No. **'23 CV 0898 JES  BLM**
                                            )
11           Plaintiffs,                     )
                                            ) **COMPLAINT FOR:**
12      vs.                                  )
                                            ) **1. VIOLATION OF THE**
13  COUNTY OF SAN DIEGO; WILLIAM GORE;       )    **FOURTEENTH AMENDMENT & 42**
    KELLY A. MARTINEZ; CITY OF SAN           )    **U.S.C. § 1983 - DELIBERATE**
14  DIEGO; SAN DIEGO POLICE DEPARTMENT;      )    **INDIFFERENCE**
    THOMAS C. MCGRATH; CHRISTIAN B.          ) **2. VIOLATION OF THE**
15  REDA; and DOES 1 through 20,             )    **FOURTEENTH AMENDMENT & 42**
                                            )    **U.S.C. § 1983 - FAILURE TO**
16           Defendants.                     )    **PROVIDE TIMELY RESTORATIVE**
                                            )    **TREATMENT**
17                                          ) **3. VIOLATION OF 42 U.S.C. § 1983 –**
                                            )    **FAILURE TO PROPERLY TRAIN**
18                                          ) **4. VIOLATION OF 42 U.S.C. § 1983 –**
                                            )    **FAILURE TO PROPERLY**
19                                          ) **SUPERVISE AND DISCIPLINE**
                                            ) **5. VIOLATION OF 42 U.S.C. § 1983 –**
20                                          )    ***MONELL* MUNICIPAL LIABILITY**
                                            )    **CIVIL RIGHTS ACTION**
21                                          ) **6. VIOLATION OF THE FOURTH**
                                            )    **AMENDMENT & 42 U.S.C. § 1983 –**
22                                          )    **EXCESSIVE FORCE**
                                            )
23  _____) **DEMAND FOR JURY TRIAL**

24         Plaintiff DYLAN ROBLES ("Plaintiff") brings this action against Defendants COUNTY

25  OF SAN DIEGO ("COUNTY"), WILLIAM GORE ("GORE"), KELLY A. MARTINEZ

26  ("MARTINEZ"), CITY OF SAN DIEGO ("CITY"), SAN DIEGO POLICE DEPARTMENT

27  ("SDPD"), THOMAS C. MCGRATH ("MCGRATH"), CHRISTIAN B. REDA ("REDA"),

28  (collectively referred to as "Defendants"), and DOES 1 through 20, inclusive, as follows:

**PARTIES**

1.     Plaintiff is, and at all relevant times was, an individual with his principal place of residence located within the city and county of San Diego, California.

2.     COUNTY is, and at all times mentioned in this complaint has been, a California "public entity" within the definition of Cal. Gov't Code § 811.2. Under its authority, COUNTY operates and manages the San Diego Central Jail ("SDCJ"), and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of SDCJ, and its respective employees and/or agents.

3.     GORE was, at all relevant times, the Sheriff of the COUNTY, the highest position in the San Diego County Sheriff's Department. As Sheriff, GORE was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Diego County Sheriff's Department custodial employees and/or agents, medical staff and DOE Defendants.

4.     MARTINEZ is, at all relevant and current times, the Sheriff of the COUNTY, the highest position in the San Diego County Sheriff's Department. As Sheriff, MARTINEZ was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Diego County Sheriff's Department custodial employees and/or agents, medical staff and DOE Defendants.

5.     GORE and MARTINEZ are sued in their individual capacity for their own personal actions or inactions for supervisory liability. For all intents and purposes, GORE was the presiding Sheriff of the COUNTY at the time of Plaintiff's injuries. MARTINEZ is named in the suit as the successor in interest to GORE and for maintaining the same policies and customs as GORE.

6.     CITY is, and at all times mentioned in this complaint has been, a California "public entity" within the definition of Cal. Gov't Code § 811.2. Under its authority, CITY operates and manages the SDPD, and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of SDPD, and its respective employees and/or agents.

7.     SDPD is, and at all times mentioned in this complaint has been, a California "public

REDEN | RIDDELL
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

entity" within the definition of Cal. Gov't Code § 811.2. Under its authority, SDPD is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions, and its respective employees and/or agents.

8.     MCGRATH is, and at all relevant times was, an individual with his principal place of residence located within the city and county of San Diego, California. MCGRATH is a police officer with the San Diego Police Department ("SDPD") – Officer Badge number SD7100.

9.     REDA is, and at all relevant times was, an individual with his principal place of residence located within the city and county of San Diego, California. REDA is a police officer with the San Diego Police Department ("SDPD") – Officer Badge number SD7520.

10.     The true names and capacities, whether individual, corporate, associate, or otherwise, of DOES 1 through 20, inclusive, are unknown to Plaintiff, who therefore sues said defendants by such fictitious names.  Defendants DOES 1 through 20, inclusive, are and/or were agents, contractors, or employees of COUNTY and/or SDCSD, and acted within the scope of that agency or employment and under color of state law. Plaintiff will ask leave of court to amend this complaint to set forth their true names and capacities when the same have been ascertained.

11.     Plaintiff is informed and believes and thereon alleges that each of the defendants designated herein as DOES 1 through 20, inclusive, is responsible in some manner for the events and happenings referred to herein and negligently, intentionally, or otherwise, caused injury and damage proximately thereby to Plaintiff as herein alleged.

12.     The legal capacities of the defendants are stated on information and belief.  Plaintiff will ask leave of court to amend this complaint to set forth the capacities of those entities of unknown form when ascertained.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction of the federal claims under 28 U.S.C. § 1331 (in that they arise under the United States Constitution) and 28 U.S.C. § 1343(a)(3) (in that the action is brought to address deprivations, under color of state authority, of rights, privileges, and immunities protected by the U.S. Constitution). This Court has supplemental jurisdiction of the state claims under 28 U.S.C. § 1367.

14.     Venue is proper in the United States District Court of the Southern District of California pursuant to 28 U.S.C. § 1391(b) because Defendants are located in the Southern District of California and because all of the acts and/or omissions described herein occurred in the Southern District of California, specifically in the City of San Diego, the County of San Diego, in the State of California.

### GENERAL ALLEGATIONS

15.     At all times relevant herein, all wrongful acts described were performed under the color of state law and/or in concert with or on behalf of those acting under the color of state law.

16.     Plaintiff is a 43-year-old man.

17.     Plaintiff was diagnosed with Type-1 Diabetes more than twenty-five years ago. Plaintiff has been on medications (insulin) since his diagnosis.

18.     Plaintiff's physical and mental health issues substantially limit major life activities, including his ability to care for himself, concentrate, think, and communicate. For example, Plaintiff's physical and mental health issues cause him easily to become confused, defensive, agitated, and frustrated; to exhibit stress, fear, anxiety, and paranoia; to experience difficulty processing information or stimulus; and to have difficulty verbalizing thoughts, feelings, and emotions.

19.     On May 17, 2021, Plaintiff was experiencing a severe medical emergency related to his health issues. Emergency services, including the San Diego Fire Department and SDPD arrived on scene at or around 6:44 p.m.

20.     Plaintiff was unconscious, unresponsive, laying face-down in his bedroom. Unprovoked, and without consent, MCGRATH violently grabbed Plaintiff's leg and continually tried to wake Plaintiff up by aggressively yanking his body across the bedroom.

21.     Plaintiff was confused, disoriented, and unaware of his surroundings. Plaintiff agreed to go to the hospital and was escorted to the back of an ambulance.

22.     MCGRATH and Plaintiff had a verbal argument and an altercation ensued.

23.     REDA deployed a taser gun on Plaintiff. Additionally, Plaintiff was injected with 10 mg of Versed (a sedative) and placed in a WRAP restraining device. Multiple officers including

REDEN | RIDDELL
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

MCGRATH and REDA pinned Plaintiff to the ground resulting in multiple bruising across Plaintiff's body.

24.     Plaintiff was arrested for a felony violation of California Penal Code § 245(c), assault of a police officer.

25.     To be evaluated for potential injuries, Plaintiff was transported by police car – rather than an ambulance – and admitted, on or around May 17, 2021, at 7:42 p.m., to the University of California, San Diego Hospital's ("UCSD") emergency room.

26.     UCSD's Emergency Department's ("ED") notes indicated that Plaintiff had a history of Type-1 Diabetes.

27.     On or around 10:58 p.m., Plaintiff's blood sugar had dropped below the normal range. UCSD medical staff administered Plaintiff glucose.

28.     On or around 11:20 p.m., Plaintiff's blood sugar rose to a level within normal range.

29.     On or around May 18, 2021, at 12:29 a.m., Plaintiff was discharged from UCSD Emergency Department and transported to SDCJ.

30.     Plaintiff's "After Visit Summary" provided the below instructions: "Patient medically cleared for transport and incarceration. While incarcerated[,] patient will require evaluation by Psychiatry due to potential for manic episode." The Summary did include language about Plaintiff's blood sugar and administration of glucose, i.e., SDCJ would be aware of the diabetes.

31.     On or around May 18, 2021, at 12:51 a.m., Plaintiff was booked into SDCJ.

32.     SDCJ placed Plaintiff into a sobering cell upon his arrival. Plaintiff was diagnosed as bi-polar and suffering from a physical disability, yet no review or assessment of Plaintiff was done in order to determine the appropriate placement for him in SDCJ.

33.     SDPD officers vaguely indicated in their intake report that Plaintiff was under the influence of a substance. No drug test or psych evaluation was done to determine whether placing Plaintiff into a sobering cell was appropriate.

34.     UCSD did not note in any report that Plaintiff was under the influence of any substance.

35.     Title 15 Minimum Standards for Local Detention Facilities, § 1056 states that:

The sobering cell . . . shall be used for temporary holding of incarcerated people who are a threat to their own safety or the safety of others **due to their state of intoxication**. A person shall be removed from the sobering cell as soon as they are able to continue the admission process or are no longer a risk to themselves or others. In no case shall a person remain in a sobering cell over six hours without an evaluation by medical or custody staff to determine whether the person has an urgent medical problem . . . . At 12 hours from the time of placement, all persons must receive an evaluation by responsible health care staff. **Intermittent direct visual observation of people held in the sobering cell shall be conducted no less than every half hour**. Such observation shall be documented. (emphasis added).

36.     Progress notes from SDCJ's medical staff indicated that they were well aware of Plaintiff's Type-1 Diabetes.

37.     The National Commission on Correctional Health Care (NCCHC) Technical Assistance Report indicates that it is SDCJ's custom and policy to provide inmates, with diabetes, a nightly diabetic check-up at 2:00 a.m.

38.     Employees and medical staff of SDCJ did not adhere to or follow the customs and polices established. There is documentation regarding the observation of Plaintiff; however, there is no documentation to support that SDCJ followed the customs and polices that were required of them. There is no documentation of Plaintiff being checked at 2:00 a.m. with regards to his blood sugar, and as he was in a sobering cell, there was no documentation that he was checked every thirty minutes.

39.     Plaintiff was later found unconscious and unresponsive on the morning of May 18, 2021, at some time around 9:00 a.m.; his blood sugar for his diabetes was not checked until 9:12 a.m. that morning.

40.     Plaintiff's blood sugar that morning was 589 mg/dL; a normal range for an adult person is 70 – 99 mg/dL. SDCJ provided Plaintiff a minimum dosage of insulin, at this time, to decrease his blood sugar.

41.     SDCJ documented that Plaintiff was checked on May 18, 2021, at 9:43 a.m.; 10:28 a.m.; 12:18 p.m.; 1:44 p.m.; 8:20 p.m.; and 8:42 p.m. Plaintiff's blood sugar levels during each check-up were well over the normal range (as much as 3-5 times over – between 279 – 545 mg/dL).

1    42.    SDCJ did not provide further insulin to Plaintiff throughout the day of May 18,

2    2021, until his transfer to UCSD. Plaintiff's blood sugar was well above the normal range and

3    started to increase again. There is no documentation on his last blood sugar levels before he was

4    transported to the hospital, but, upon information and belief, his glucose levels were over 500

5    mg/dL.

6    43.    The Emergency Room Referral prepared by SDCJ indicated that Plaintiff vomited

7    multiple times and had an altered level of consciousness due to suffering from

8    Hyper/Hypoglycemia.

9    44.    On or around May 19, 2021, at 12:11 a.m., SDCJ transferred Plaintiff to UCSD for

10   medical treatment. He was transported by ambulance.

11   45.    On or around May 19, 2021, at 12:41 a.m., Plaintiff arrived at UCSD's Emergency

12   Department for medical treatment. During transportation to UCSD, EMS took his blood sugar,

13   which was at 530 mg/dL. Plaintiff was covered in his own vomit when he arrived at UCSD. The

14   initial ED Provider notes from Sharika Kumari Sheth, MD stated that Plaintiff was presenting with

15   hyperglycemia, was sweating heavily (diaphoretic), and was vomiting. It was noted that Plaintiff

16   was hyperglycemic while in custody with his blood sugar at or around the time of admission to the

17   ED being 400 mg/dL.

18   46.    Plaintiff was then admitted to the intensive care unit of UCSD for Diabetic

19   Ketoacidosis ("DKA"). DKA is a potentially life-threatening complication of diabetes; signs and

20   symptoms may include vomiting, abdominal pain, deep gasping breathing, increased urination,

21   weakness, confusion and occasionally loss of consciousness. DKA is typically diagnosed when

22   testing finds high blood sugar, low blood pH and ketoacids in either the blood or urine.

23   47.    UCSD noted in Plaintiff's file that his DKA episode likely contributed to Plaintiff

24   suffering delirium and confusion, which likely would have been an ongoing occurrence throughout

25   May 17, 2021, and May 18, 2021, during the altercation and Plaintiff remaining in custody at

26   SDCJ.

27   48.    Plaintiff's symptoms eventually resolved after two days at UCSD.

28   49.    On or around May 21, 2021, Plaintiff was discharged from UCSD.

REDEN | RIDDELL
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

**Defendants Customs and Policies of Unconstitutional Conduct**

50.    There has been a systemic failure to adhere to the written policies and procedures with respect to providing adequate health care to inmates in the San Diego County jails.

51.    There has been a systemic failure in San Diego County to investigate incidents of medical neglect, staff misconduct, serious injuries and deaths in the Jail.

52.    At the time of Plaintiff's incident, there had been a long-standing custom and practice of improper and inadequate investigations; cover-up of misconduct; and failure to discipline and train deputies and medical staff.

53.    Deaths of sixty (60) inmates in the San Diego County jails in a span of five (5) years prompted a series of articles by Citybeat, a local newspaper. Citybeat reported that San Diego County had the highest mortality rate among California's largest jail systems based on data from 2007 to 2012. Defendants were and are well aware of these problems.

54.    Citybeat reported that between 2007 and 2012, San Diego County averaged ten (10) deaths a year, with a high of twelve (12) in 2009 and a low of eight (8) in both 2007 and 2012.

55.    Citybeat reported in a follow-up article that twelve (12) people died in 2013. In 2014, sixteen (16) county-jail inmates died.

56.    Defendants were and are aware of the following examples of failure to coordinate and share critical medical information among personnel, and other widespread problems at the San Diego County jails, such as the following:

57.    Inmates Jeff Dewall (2008) and Tommy Tucker (2009) died at the hands of jail deputies due to oxygen deprivation when guards attempted to restrain them. In the case of Tommy Tucker (who suffered from serious psychiatric conditions), deputies who were involved in the use of force sat together in the supervisor's office at the Central Jail and discussed what happened before writing a report. The deputy statements were inconsistent with the video of the event and the physical evidence. Upon information and belief, none of the deputies were reprimanded. The Citizens' Law Enforcement Review Board ("CLERB") did not investigate Tommy Tucker's death.

58.    Between 2007 and 2012, there were eight deaths in San Diego's jails that were drug-related. They were either overdoses or physical complications due to withdrawal. Richard Diaz, a

40-year-old addict, died from a stomach obstruction after three days of seizures and vomiting due to heroin withdrawal.

59.    In 2008, after the suicide of Adrian Correa, a 21-year-old paranoid schizophrenic who had threatened to kill himself multiple times, CLERB expressed concern about a breakdown in communication during shift changes: "A checklist that includes the status of at-risk inmates and the Department's response plan would enhance continuity of care, monitoring and housing."

60.    In response to CLERB, Earl Goldstein, the Sheriff's medical director at that time, rejected the recommendation, saying that the jail's suicide rate was low—only four suicides total during the 2007-2008 and 2008-2009 fiscal years (July 1, 2007, through June 30, 2009). There were actually six suicides during that period. Goldstein wrote: "Based on . . . the low incidences of completed suicides in our facilities, it is not practical to add these systems to the current program."

61.    In a March 2011 letter to the Sheriff, CLERB expressed concern that the department did not have formal policies regarding when it would alert CLERB of an inmate's death, despite the County Code's endowing the board with clear oversight responsibilities. Per state law, CLERB is allowed one year to initiate an investigation. There were cases in 2009 and 2010 that the Board didn't find out about in time in order to timely begin an investigation. CLERB identified five areas in which it wanted to be included in the notification process; the Sheriff declined to initiate all of them.

62.    "We strive to respond with professionalism and a spirit of cooperation to recommendations for improvement to the policies and procedures," Sheriff's Department Executive Manager John Madigan wrote in response. "CLERB has significantly contributed to the enhancement [of] these important documents and we appreciate the Board's insight." But, he concluded: "After due consideration, Sheriff Gore respectfully declines to modify the policies and procedures as suggested by CLERB."

63.    In 2013, two years after Gore refused to implement changes to the policies regarding CLERB, the Department failed to notify CLERB regarding the suicide death of Dervin Bowman. The Department only turned the case over when CityBeat inquired about Mr. Bowman's death

64.    On June 25, 2011, Daniel Sisson died from an acute asthma attack made worse by

drug withdrawal. The San Diego County Medical Examiner estimated in an autopsy report that Sisson had been dead for several hours when a fellow inmate found him. The jail staff had failed to monitor him despite his exhibiting signs of withdrawal and his vomiting in his cell due to the lack of communication between staff.

65.     In September 2012, Bernard Victorianne suffered for five days from drug overdose because the staff ignored his medical information that he had ingested a baggie of methamphetamine, and that he was to return to the hospital immediately if he became symptomatic of overdose. Bernard Victorianne was placed in segregation instead of Medical, where he was found dead face-down, naked in his cell. Staff had failed to input critical medical information in the JIMS system. Staff had failed to communicate with each other Mr. Victorianne's medical alerts which required that the staff report symptoms of overdose and take him immediately to the hospital.

66.     As Mr. Victorianne laid on the floor of his cell, naked and unconscious, none of the deputies conducted proper security checks, soft counts or hard counts, which requires the deputies to scan the wrist band of each inmate. One deputy was told by an inmate that Mr. Victorianne was not breathing. This deputy kicked Mr. Victorianne; stated that Mr. Victorianne "twitched"; and left him to die in his cell. These deputies failed to conduct proper checks then lied about it to investigators.

67.     The supervisors then covered up for their subordinates by interfering with the investigation, preventing Homicide investigators from interviewing the last deputies to see Mr. Victorianne alive. After his own staff issued a recommendation that certain staff members be reprimanded for lying, Defendant GORE refused to follow it.

68.     In 2014, Hector Lleras told jail staff that he was suicidal. He was placed in a safety cell for a day. Twenty-four hours after he was released from a safety cell, he hanged himself.

69.     In 2014, Christopher Carroll, who was mentally ill, was placed in segregation. He was found dead with a noose around his neck. Mr. Carroll had smeared blood on the wall of his cell. He had urinated on the floor and food and feces were stuck to the ceiling.

70.     In 2014, former U.S. Marine Kristopher NeSmith committed suicide after the jail

staff failed to treat Mr. NeSmith for his significant and known mental illness and a history of suicide attempts. When Mr. NeSmith was last seen alive about 10:00 p.m., a guard noticed a bedsheet fashioned into a rope as he was making a routine safety throughout the detention center. The deputy, without breaking stride, said something to the effect of, "NeSmith, what are you trying to do? Kill yourself? Take that thing down." No other jail staff took any further action. Mr. NeSmith was later found dead, having hung himself.

71.     When Mr. NeSmith's widow sued the County over his death, she cited to the San Diego CityBeat article titled "60 Dead Inmates" by Kelly Davis, an award-winning journalist who exposed the problem of the high death rates in the Jails. San Diego officials then targeted Davis, subpoenaing her to divulge all the information and sources she used for her story, including confidential discussions with attorneys about the wrongful death lawsuits. The County then filed a motion to compel. Instead of addressing the known problems in the Jail, its officials targeted this journalist with the intent to silence any criticism and public attention.

72.     In 2014, Ronnie Sandoval died in the Jail from drug overdose. Mr. Sandoval showed obvious symptoms of overdose, sweating profusely and disoriented. The corrections staff told the nursing staff that Mr. Sandoval needed medical treatment, two of them stating that Mr. Sandoval was withdrawing from drugs. The nursing staff did not summon help or treat him for overdose. The nurses failed to pass down information regarding Mr. Sandoval's condition during the shift change. Mr. Sandoval died from drug intoxication.

73.     In 2015, Ruben Nunez, a schizophrenic mental health patient transferred from Patton State Hospital, died when jail doctors failed to treat a potentially lethal condition for water intoxication. The psychiatrists treating Mr. Nunez failed to read his medical records and failed to input critical medical information in JIMS. One of the psychiatrists testified that she did not know how to use JIMS to add "alerts", meaning the most critical information regarding a patient's care. She testified that she was never trained.

74.     Despite the medical records from Patton Hospital reflecting hyponatremia, a condition caused by overconsumption of water, a nurse noted in Mr. Nunez's chart: "Informed I/P that he will seen [sic] by psych for f/u Exercise as tolerated and **drink plenty of water** I/P verbalizes

REDEN | RIDDELL
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

understanding and agrees to plan." (Emphasis added).

75.     This nurse failed to document Mr. Nunez's medical records, leaving nearly the entire seven pages of an intake form blank.

76.     According to one of the nursing staff, the intake nurses do not have sufficient time to read medical records or to conduct a thorough intake because of the number of inmates being booked at once. The intake nurses only have sufficient time to look to whether the Jail will book the person into jail.

77.     In Mr. Nunez's case, a deputy saw Mr. Nunez in his cell sitting in his own vomit and urine. A nurse told this deputy to take Mr. Nunez to Medical. Despite seeing Mr. Nunez twice in this condition, this deputy failed to summon help or take Mr. Nunez to Medical as directed. Mr. Nunez died from overconsumption of water.

78.     In 2016, Heron Moriarty was arrested after having a psychotic break. Despite multiple warnings by family members, including 28 telephone calls by his wife, the Jail staff failed to provide him psychiatric care. On the sixth day, Mr. Moriarty was found dead in his cell, having hung himself.

79.     In 2016, Jason Nishimoto killed himself with a bedsheet on his fourth night in Jail, the evening before he was scheduled to see a psychiatrist. His psychiatric condition was well known to the Jail staff.

80.     In 2018, four inmates committed suicide in the Jails.

81.     On or around December 17, 2017, several months before this incident, George Bryan fell off the top bunk of his cell at the Central Jail, seriously injuring himself.

82.     There had been multiple instances of inmates falling off the top bunks at the San Diego Jails resulting in injuries, many of them serious.

83.     These are just a few examples of the customs and/or policies of the Sheriff's Department which sent the message to staff that negligence, dishonesty and improprieties will be tolerated by the Department, even when a death results.

84.     Despite well-known problems of deaths and serious injuries from improper monitoring of inmates and failure to render adequate medical care, GORE and MARTINEZ,

continued to cover up their subordinates' misconduct. After the deaths of Messrs. Nishimoto, Nunez, and Moriarty, the Medical Director for the San Diego County Sheriff's Department agreed with the private contractor, CPMG, that they would make documents "non-discoverable" during litigation. The COUNTY withheld critical evidence from the families of these decedents in order to keep the misconduct of the CPMG psychiatrists a secret.

85.    The Grand Jury took issue with the Jail Information Management System (JIMS), a database used for maintaining inmate records. According to jail staff who commented to jurors for the report, the staff have trouble sorting and retrieving information and the eleven-year old software was in need of an update. See https://www.nbcsandiego.com/investigations/Grand-Jury-Report-Criticizes-San-Diego-County-Jail-Facilities-381590761.html

86.    The County's investigative body, CLERB, which has the responsibility to investigate all in-custody deaths, has just five paid employees. CLERB consists of eleven volunteers, who are not required to have previous special training or experience in investigations or any other relevant topics related to jail operations, Constitutional requirements, or law.

87.    CLERB members are appointed by the County Board of Supervisors.

88.    CLERB does not control its budget. It cannot hire investigative staff itself, even when required to complete its work.

89.    While CLERB has the authority to annually inspect county adult detention facilities and annually file a report of such visitations together with pertinent recommendations on issues including detention, care, custody, training and treatment of inmates, CLERB has history of failing to conduct investigations.

90.    By October of 2017, CLERB had 59 open in-custody death investigations, including a death going back six years.

91.    On November 11, 2017, CLERB announced that it was summarily dismissing 22 death cases without review. CLERB dismissed these cases based on a one-year time limitation for imposing officer discipline for misconduct. This is despite the fact that CLERB has publicly stated that "death cases and other complex investigations often take more than one year to complete."

92.    There is no mechanism for an independent investigation of the misconduct of the

medical staff. The County does not empower CLERB to investigate or propose discipline for the misconduct of any medical staff.

93.     In 2018, Disability Rights California (DRC), the largest disability rights group in the United States, issued the findings from a study of San Diego County Jails, which reviewed suicide deaths from December 2014 to 2016.

94.     According to DRC, its experts identified several deficiencies in San Diego County's clinical referral and evaluation practices.

95.     The DRC experts found a significant number of failures on the part of San Diego County Jails from intake of inmates, housing placements, communication between custodial staff and mental health staff, to coordination of care. The experts found that San Diego County has no functioning quality improvement program to improve health care by identifying problems, and by implementing and monitoring corrective actions.

96.     Even though inmates are dying or suffering catastrophic injuries at an alarming rate at San Diego County Jails, the medical and correctional staff whose actions or inactions cause the deaths are not investigated; not informed of their failures; not given further training or remedial instruction; and are not monitored or closely supervised after these adverse events. No medical or correctional staff faced any consequence for their conduct.

97.     On November 8, 2016, the San Diego Sheriff's Department contracted for assistance regarding compliance with the NCCHC Standards for Health Services in Jails.

98.     In January 2017, the NCCHC provided a report to the San Diego Sheriff's Department after reviewing the practices of its Jails. Of the 38 "essential standards" all of which must be met in order to attain accreditation, the Central Jail failed to meet 26 standards.

99.     NCCHC found that the Jails were failing to review inmates' deaths in a timely manner.

100.     Health care providers were not being informed of any results of death reviews.

101.     NCCHC found that there was no formal peer review process for contract medical providers or for nurses.

102.     NCCHC found that the inmate grievances were hard to track and that it was difficult

to count the number of medical grievances. When an inmate filed a grievance related to medical issues, the health care staff would not maintain it in Medical's database. Because all grievances are kept in the same central database with no ability to sort, health related grievances filed per month or year were not available.

103.    NCCHC found that there was no policy addressing the time frame between ordering medication and receiving from the pharmacist. NCCHC found that some essential medications are delayed due to the length of the booking process.

104.    NCCHC found that missing in the screening form was the "disposition" of the inmate, which would communicate to the next health care provider where the patient would be housed.

105.    NCCHC advised, "we confirmed that there was a system of episodic care, instead of continuity of care, with most appointments being made after a request for care was submitted by the patient."

106.    In October of 2019, three years after the County paid NCCHC $100,000 for the study, the Union Tribune reported that it would be difficult to win accreditation by 2020, the timeline the Jail officials had outlined. See https://www.sandiegouniontribune.com/news/watchdog/story/2019-10-13/sheriffs-quest-for-jail-accreditation-to-take-time-money-and-culture-shift.

107.    Indeed, as of today's date, there has never been accreditation.

108.    As the UT noted, the NCCHC consultants found that correctional staff was not formally trained to recognize inmate drug and alcohol issues.

109.    The UT wrote that mentally ill inmates were kept in isolation, with little evidence of monitoring for "mental condition, hygiene, orientation or how they were adjusting."

110.    According to the article, jails had significant backlogs of requests for medical care.

111.    In another pending lawsuit, the County officials admitted that the Medical Director and the Medical Administrator, the chief of the medical department, never read the NCCHC report.

112.    According to the article, "at the central jail, where 73 inmates have died since 2009, the report said the staff needed to do a better job looking into and communicating what caused an

inmate's death so they can prevent similar incidents in the future, the consultants said."

113.    Sheriff Gore declined to be interviewed for the article, but his staff told the UT that there were many NCCHC standards that needed to be met.

114.    Although the County of San Diego and Gore were aware of Constitutional deficiencies in the delivery of seriously needed medical and psychiatric care due to the NCCHC audit, and the high number of deaths and injuries suffered by inmates, they took no steps to provide additional training and supervision to their subordinates.  The failure to provide additional training and supervision to their subordinates was a moving force causing the ultimate injury to Plaintiff.

115.    The California State Auditor said in a scathing report that San Diego County jails are so unsafe and deficient that state lawmakers should intervene by forcing the Sheriff's Department to change course.

116.    After the state of California performed an audit of 815 deaths in the County Jails, Michael Tilden, acting state auditor, wrote: "Our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths."

117.    "These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody."

118.    Mirroring what the community members and experts have repeatedly told the Sheriff over the past decade, the Auditor wrote: "The high rate of deaths in San Diego County's jails (as) compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices."

119.    The audit said the Sheriff's Department "did not consistently follow up with" inmates who needed medical and mental health services and concluded that lack of attention may have contributed to their deaths.

120.    The report noted that when deputies did check up on inmates, these "safety checks" often amounted to inadequate glances that sometimes missed inmates in distress.

121.    "In our review of 30 in-custody deaths ... based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the

individuals' cells, sometimes without breaking stride, as they walked through the housing module," the audit said. "When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours."

122.   The auditors said San Diego County jails can only be fixed by legislation requiring the Sheriff's Department to implement a series of recommendations spelled out in the 126-page report.

123.   "In fact, our review identified deficiencies with how the sheriff's department provides care for and protects incarcerated individuals (that) likely contributed to in-custody deaths..."

124.   State auditors found that the department has yet to meaningfully implement recommendations made by independent experts over the last several years.

125.   "Given the ongoing risk to the safety of incarcerated individuals, the Sheriff's Department's inadequate response to deaths and the lack of effective independent oversight, we believe the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes," the report said.

126.   The audit was commissioned a few years ago by a group of San Diego County legislators in response to mounting complaints from constituents that too many people have died in local jails.

## **FIRST CAUSE OF ACTION**

**(Deliberate Indifference – U.S. Const. amend. XIV; 42 U.S.C. § 1983 – Against Defendants COUNTY, GORE, MARTINEZ, and DOES 1 through 20)**

127.   Plaintiff realleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint as if fully set forth herein.

128.   Defendants refused to provide Plaintiff with necessary medical care and/or insufficiently classified and housed Plaintiff putting him at substantial risk of suffering serious harm, without taking reasonable available measures to abate that risk, where a reasonable official in the circumstances would have appreciated the high degree of risk involved, in violation of Plaintiff's rights protected by the Fourteenth Amendment to the U.S. Constitution.

REDEN | RIDDELL
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

129. Defendants acting as policymaking authorities, maintained polices or customs of action and inaction resulting in harm, in violation of Plaintiff's rights protected by the Fourteenth Amendment to the U.S. Constitution.

130. Defendants knew Plaintiff was in urgent need of medical attention and treatment.

131. Defendants knew there was a substantial risk to Plaintiff's health if he went untreated, but repeatedly refused to treat her.

132. As a result of the repeated denial of medical care, Plaintiff spent his time in Defendants' custody in unnecessary and excruciating pain, suffering, and agony.

133. Defendants, by ignoring Plaintiff and by failing to provide proper medical attention, acted with deliberate indifference to a serious health condition and Plaintiff's medical needs.

134. Defendants by their acts of deliberate indifference in failing to provide medical care to treat Plaintiff's serious medical condition, the conduct thereof constitutes cruel and unusual punishment in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

135. Defendants were deliberately indifferent to Plaintiff's serious medical needs. It is clear that a reasonable County employee / agent (whether jail employee / agent or Sheriff's deputy) that by denying medical care, Plaintiff was exposed to undue suffering and threat of tangible residual injury. Defendants intentionally denied Plaintiff proper medical care by failing to treat, timely refer to a doctor, or timely transfer Plaintiff for proper medical care, causing him to suffer for approximately two to three days.

136. Had Defendants not acted with deliberate indifference to Plaintiff's obvious, serious health needs and provided medical attention, Plaintiff would not have suffered the damages alleged herein.

137. The damages Plaintiff suffered were easily avoidable.

138. Defendants' actions and inactions were motivated by evil motive or intent, involved reckless or callous indifference to constitutional rights, or were wantonly or oppressively done.

139. Plaintiff was injured as a direct and proximate result of Defendants' actions and inactions entitling him to receive compensatory against Defendants and punitive damages against

REDEN | RIDDELL
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

Defendants DOES 1 through 20, inclusive.

140.    Wherefore, Plaintiff prays for relief as hereunder appears.

## SECOND CAUSE OF ACTION

**(Failure to Provide Timely Restorative Treatment – U.S. Const. amend. XIV; 42 U.S.C. §**

**1983 – Against Defendants COUNTY, GORE, MARTINEZ, and DOES 1 through 20)**

141.    Plaintiff realleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint as if fully set forth herein.

142.    Defendants refused to provide Plaintiff with timely restorative treatment, putting him at substantial risk of suffering serious harm, without taking reasonable available measures to abate that risk, where a reasonable official in the circumstances would have appreciated the high degree of risk involved, in violation of Plaintiff's rights protected by the Fourteenth Amendment to the U.S. Constitution.

143.    Defendants' actions and inactions were motivated by evil motive or intent, involved reckless or callous indifference to constitutional rights, or were wantonly or oppressively done.

144.    Plaintiff was injured as a direct and proximate result of Defendants' actions and inactions entitling him to receive compensatory against Defendants and punitive damages against DOES 1 through 20, inclusive.

145.    Wherefore, Plaintiff prays for relief as hereunder appears.

## THIRD CAUSE OF ACTION

**(Failure to Properly Train – 42 U.S.C. § 1983 – Against Defendants COUNTY, GORE,**

**MARTINEZ, and DOES 1 through 20)**

146.    Plaintiff realleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint as if fully set forth herein.

147.    Defendants failed to properly train its deputies and medical staff in the performance of their duties with respect to the treatment of patients suffering from diabetes. They did so knowing that many of the people coming into the Jails suffered from long-term chronic diseases and that multiple inmates had died in the jails from failure to provide proper medical care.

148.    Defendants knew that people who are suffering from diabetes are medically

REDEN | RIDDELL
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

vulnerable and that booking inmates with diabetes was not an uncommon situation. Despite this knowledge, they failed to properly train their subordinates on how to identify inmates suffering diabetes.

149. Defendants failed to train their subordinates on how to deal with and treat inmates suffering diabetes.

150. Defendants failed to train their subordinates on how to deal with inmates in medical distress.

151. Defendants failed to train their subordinates on the need to communicate critical medical information to each other.

152. Defendants had a non-delegable duty to ensure that all subordinates and contract employees were properly trained to meet the needs of their inmate patients.

153. Defendant GORE knew that his subordinates were failing to communicate critical medical information to each other. He knew that countless people died as a result of the failure to transmit critical information and that patients were being denied basic medical care.

154. Defendant GORE knew that his deputies were consistently failing to conduct proper cell checks, leading to numerous death and serious injuries. Defendant GORE knew that his housing deputies were failing to place patients and inmates in proper housing units where they could be monitored for their serious medical needs. Other inmates improperly placed in temporary housing cells had died as a direct result of the failure to place them in medical units in order to monitor them. Despite this knowledge, Defendant GORE failed to train his staff.

155. As a result of Defendants' failures to train their subordinates, diabetes' was not communicated or identified; he was not transported to the hospital after the staff were made aware that Plaintiff was suffering from hypo/hyperglycemia; he was not given medication for his high blood sugar; he was not placed in the appropriate unit for monitoring; and he was not monitored. Plaintiff's hospitalization was a foreseeable consequence of Defendants' failures.

156. Officials of the San Diego Sheriff's Department, acting under color of law, have subjected Plaintiff and other persons similarly situated to a pattern of conduct consisting of continuing, widespread and persistent pattern of unconstitutional misconduct.

157.    Defendants have failed to maintain adequate and proper training necessary to educate deputies and medical staff as to the Constitutional rights of inmates; and to prevent the consistent and systematic failure to provide medical care.

158.    Defendants have failed to maintain adequate and proper training necessary to educate deputies and medical staff as to the need to monitor patients exhibiting symptoms of serious medical conditions.

159.    Despite repeated Constitutional violations, Defendants failed to train doctors, nurses and other staff on the necessary coordination of care of inmates suffering from serious medical conditions; and they failed to implement policies and procedures with respect to proper training on these matters.

160.    DOES failed to train medical doctors and nurses on the necessary care of inmates suffering from serious medical conditions including diabetes, and they failed to implement policies and procedures with respect to communicating such sensitive and critical information to ensure that inmates will be cared for.

161.    Despite specific knowledge that critical medical information was not being communicated from the medical staff to sworn staff, Defendants took no action.

162.    Despite their knowledge of previous instances of wrongful deaths and hospitalizations in the jails as a result of the failure to communicate critical medical conditions, Defendants failed to properly train or retrain their deputies and medical staff to prevent deaths/hospitalizations of inmates.

163.    The failure of all supervisory defendants to promulgate or maintain constitutionally adequate training was done with deliberate indifference to the rights of Plaintiff and others in his position.

164.    As a result, Plaintiff has suffered, both physically and mentally.

165.    As a direct consequence of the failure of Defendants to properly train their officers and medical staff, Plaintiff suffered unconstitutional treatment and inhumane conditions during his detention.

166.    Wherefore, Plaintiff prays for relief as hereunder appears.

**FOURTH CAUSE OF ACTION**

**(Failure to Properly Supervise and Discipline – 42 U.S.C. § 1983 – Against Defendants COUNTY, GORE, MARTINEZ, and DOES 1 through 20)**

167.    Plaintiff realleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint as if fully set forth herein.

168.    Defendants failed to properly supervise their subordinates with regard to the need to communicate critical medical information and the need to provide adequate care. As a result, crucial information regarding Plaintiff's diabetes and bi-polar disorder were not communicated to medical intake staff or housing staff. As a further result, correctional officers and medical care providers denied care to Plaintiff.

169.    Defendants failed to provide adequate supervision and discipline to the medical staff who are required to render medical care that meets the standards of the Constitution. Defendants failed to provide adequate supervision and discipline to the medical staff who are required to accurately assess critical medical conditions. They failed to provide adequate supervision and discipline to the medical staff on when to refer a patient to a doctor or to a hospital when the patient has critical conditions requiring higher levels of care.

170.    Defendants failed to provide adequate supervision and discipline to sworn staff with regard to proper monitoring of inmates who are required to be watched.

171.    Defendants failed to promulgate and enforce adequate policies and procedures related to misconduct and the violation of citizens' civil rights by correctional officers and medical staff.

172.    Defendants have a widespread history of ratifying employee misconduct by failing to conduct appropriate investigations.

173.    Defendants were aware previous instances of untimely and wrongful deaths, along with other incapacitating emergencies suffered by inmates, in San Diego County Jails related to inadequate provision of medical care, and they failed to supervise and discipline their employees or agents.

174.    Defendants refused to investigate misconduct and/or took no remedial steps or

REDEN | RIDDELL
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

action against correctional officers and medical staff.

175. Upon information and belief, supervising officers were made aware of the misconduct or witnessed the Constitutional violations committed by the deputies and medical staff but failed d to supervise or discipline them.

176. There has been an official policy of acquiescence in the wrongful conduct. Defendants failed to promulgate corrective polices and regulations in the face of repeated Constitutional violations.

177. Defendants condoned and acquiesced in the abusive behavior of their subordinates by reusing to retrain them, discipline them, or correct their abusive behavior.

178. Defendants were, or should have been, aware that the policy regarding supervision and discipline of staff that violated the civil rights of inmates or citizens was so inadequate that it was obvious that a failure to correct it would result in further incidents of dangerous and lawless conduct perpetrated by their subordinates.

179. As a result of all Defendants' historical failure to properly supervise and discipline deputies, Defendants were deliberately indifferent to the needs of Plaintiff. The failure to supervise and discipline was the moving force behind the misconduct of the deputies, the denial of medical care on the Plaintiff, and the resulting pain and suffering.

180. Wherefore, Plaintiff prays for relief as hereunder appears.

## FIFTH CAUSE OF ACTION

**(*Monell* Municipal Liability Civil Rights Action – 42 U.S.C. § 1983 – Against Defendants COUNTY, GORE, MARTINEZ, and DOES 1 through 20)**

181. Plaintiff realleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint as if fully set forth herein.

182. There were longstanding and systemic deficiencies in San Diego jails' treatment of inmates. Deficiencies included failure to render medical care, failure to identify critical and obvious medical needs at intake, failure to properly screen for immediate medical needs, failure to implement protocols to treat inmates suffering from drug or alcohol withdrawal, improper cell checks, inadequate medical staffing, lack of required training on screening, lack of communication

of necessary and critical medical information among staff for continuity of care, and non-compliant medical policies and procedures.

183.    Upon information and belief, the written policy on identification and treatment of inmates suffering from diabetes was deficient on its face. It did not sufficiently train staff on how to recognize signs of hyper/hypoglycemia, or provide standards for treating inmates with diabetes, or establish protocols to ensure inmates suffering from hyper/hypoglycemia were sent to a hospital.

184.    The written policy was deficient in its failure to specify the treatment and monitoring protocol required to deal with hyper/hypoglycemia, i.e., an inmate diagnosed with diabetes.

185.    The written policy was deficient on its face because it failed to specify when medical staff were required to refer the patient to a doctor or transport the patient to the hospital.

186.    The written policy was deficient on when to place the patient in a sobering cell or medical observation placement, rather than in a regular holding cell.

187.    There was a *de facto* custom of allowing staff to fail render care to patients suffering medical distress and ignoring the obvious symptoms and risk factors, including leaving them unsupervised in a cell.

188.    There was a *de facto* custom of not properly screening patients for medical care or treatment.

189.    There was a *de facto* custom of ignoring critical medical information and not properly checking on the welfare of patients, even those known to have serious medical needs.

190.    There was a *de facto* custom of not ensuring that deputies follow the policies and procedures with respect to emergency situations within Housing units.

191.    There was a *de facto* custom of failing to conduct proper cell checks or monitoring, as required by the County's own written policies.

192.    Defendants' failure to train its deputies and medical staff gives inference of a municipal custom that authorized or condoned deputy misconduct.

193.    There has been a longstanding pattern of failing to provide adequate medical causing a series of preventable and tragic deaths that placed these defendants on notice.

REDEN | RIDDELL
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

194.    The COUNTY is further liable because the cumulative and persistent failures and misdeeds of the entire Sheriff's Department at the Central Jail caused the ultimate injury and harm suffered by Plaintiff.

195.    Plaintiff's constitutional deprivations were not only caused by the conduct of individual officers, but also resulted from the collective inaction of the San Diego County Sheriff's Department. Plaintiff's constitutional deprivations were further caused by the subordinates' adherence to customs and practices as alleged herein. *See Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002); *see also Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019).

196.    There has been a custom and practice of acquiescence in the wrongful conduct of Sheriff's Department's subordinates. Defendant COUNTY failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.

197.    Defendant COUNTY condoned and acquiesced in the abusive behavior of its subordinates by refusing to retrain them, discipline them, or correct their abusive behaviors. The County ratified the actions of the individual defendants by failing to take any action after Omar's death.

198.    Defendant COUNTY was, or should have been, aware that the program regarding supervision and discipline of subordinates, who violated the civil rights of inmates or citizens, was so inadequate that it was obvious that a failure to correct it would result in further incidents or dangerous or lawless conduct perpetrated by their subordinates.

199.    As a result of all Defendants' historical failure to properly supervise and discipline employees/agents, Defendants, and each of them, were deliberately indifferent to the needs of Plaintiff. The failure to supervise and discipline was the moving force behind the misconduct of the employees/agents, the denial of medical care on Plaintiff, and the resulting pain and suffering.

200.    Wherefore, Plaintiff prays for relief as hereunder appears.

## SIXTH CAUSE OF ACTION

**(Excessive Force – 42 U.S.C. § 1983 – Against Defendants CITY, SDPD, MCGRATH, REDA, and DOES 1 through 20)**

201.    Plaintiff realleges and incorporates herein by this reference each and every

REDEN | RIDDELL
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

allegation set forth in all previous paragraphs of the Complaint as if fully set forth herein.

202.    42 U.S.C. § 1983 states, in pertinent part, that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory subjects, or causes to be subjected, any person of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit at equity or other proper proceeding for redress.

203.    The Fourth Amendment Prohibits the use of excessive force by police officers as unreasonable seizures.

204.    Clearly established law prohibited Defendants MCGRATH and REDA from using force against Plaintiff.

205.    MCGRATH used excessive force when he violently grabbed Plaintiff's leg while he was unconscious and tried to wake him up. MCGRATH was responding to a call for a medical emergency. Plaintiff was not a criminal and there was no reasonable suspicion that any laws were violated, but rather than allow EMS to provide aid, MCGRATH physically assaulted Plaintiff while he was unconscious.

206.    REDA unnecessarily deployed a taser gun on Plaintiff. Plaintiff was standing in an elevated position on the back of an ambulance and the action by REDA caused Plaintiff to seize and fall to the ground where he sustained multiple bruises and lacerations. REDA could have deployed other measures to restrain Plaintiff, but instead chose a potentially lethal option on an unarmed individual.

207.    MCGRATH and REDA were acting under color of law, in uniform, and with a CITY issued firearm, used excessive force and assaulted Plaintiff.

208.    MCGRATH and REDA were acting within the course and scope of their employment with the SDPD.

209.    MCGRATH and REDA's actions under color of law violated Plaintiff's Fourth Amendment rights and caused him injury.

210.    As a result of MCGRATH and REDA's conduct, Plaintiff suffered pain, fear, and shock.

211.   MCGRATH and REDA's actions were oppressive, malicious and in reckless disregard of Plaintiff's Fourth Amendment rights.

212.   Wherefore, Plaintiff prays for relief as hereunder appears.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them as follows:

1. For an award of compensatory, general, special, and nominal damages against Defendants COUNTY, GORE, MARTINEZ, CITY, SDPD, MCGRATH, REDA and DOES 1 through 20, inclusive, according to proof at trial;

2. For an award of punitive and exemplary damages against Defendants GORE, MARTINEZ, MCGRATH, REDA and DOES 1 through 20, inclusive, in amount sufficient to deter and to make an example of them, because their actions and/or inactions, as alleged, were motived by evil motive or intent, involved reckless or callous indifference to constitutionally protected rights, or were wantonly or oppressively done, and/or constituted oppression and/or malice resulting in great harm;

3. For an award of actual damages, treble damages, punitive damages, civil penalties, and any other available relief against Defendants COUNTY, GORE, MARTINEZ, CITY, SDPD, MCGRATH, REDA and DOES 1 through 20, inclusive, pursuant to Cal. Civ. Code §§ 52, 52.1, and any other statute as may be applicable (expect that no punitive damages are sought against Defendant COUNTNY, CITY or SDPD pursuant to Cal. Civ. Code § 818);

4. For interest at the legal rates;

5. For an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, Cal. Civ. Proc. Code § 1021.5, and any other statute as may be applicable;

6. For all costs of suit; and

7. For all other and further relief as the Court may deem just and proper.

Dated: May 16, 2023                    REDEN | RIDDELL


                                  By:  _____s/Justin G. Reden, Esq._____
                                       Justin G. Reden, Esq.
                                       Collin E. Cresap, Esq.
                                       Attorneys for Plaintiff
                                       DYLAN ROBLES

REDEN | RIDDELL
16885 Via Del Campo Court, Suite 320 San Diego, CA 92127

COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff DYLAN ROBLES hereby demands trial by jury of all claims and causes of action so triable.

Dated: May 16, 2023                                     REDEN | RIDDELL


By:      s/Justin G. Reden, Esq.
         Justin G. Reden, Esq.
         Collin E. Cresap, Esq.
         Attorneys for Plaintiff
         DYLAN ROBLES