UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DYLAN ROBLES,

                                        Plaintiff,

v.

COUNTY OF SAN DIEGO et al.,

                                        Defendants.

Case No.:  3:23-cv-00898-JES-BLM

**ORDER GRANTING MOTION TO DISMISS**

**[ECF Nos. 11, 12, 13]**

Before the Court is Defendants' County of San Diego ("County"), William Gore ("Sheriff Gore"), Kelly A. Martinez ("Sheriff Martinez"), (collectively known as "County Defendants"), and City of San Diego ("City"), Thomas C. McGrath ("Sgt. McGrath"), Christian Reda ("Ofc. Reda"), (collectively known as "City Defendants") motion to dismiss the First Amended Complaint ("FAC"). The County Defendants filed their motion on September 8, 2023, and did not request oral argument. ECF No. 11. The City Defendants filed their motion on September 18, 2023, along with a request for judicial notice and a motion to file documents under seal. ECF Nos. 12, 13. Dylan Robles

("Plaintiff") filed a response to each motion and an objection to the City Defendants' request for judicial notice. ECF Nos. 18, 19, 20. The City and County Defendants both filed reply briefs. ECF Nos. 22, 23. The Court heard oral argument on the City Defendants' motion on November 13, 2023, and took the matter under submission. ECF No. 24. For the reasons stated below, the Court **GRANTS** the motion to dismiss as to all Defendants.

## I.    BACKGROUND

### A. Plaintiff's Allegations

Plaintiff is a 43-year-old man who was diagnosed with Type-1 diabetes more than twenty-five years ago. FAC ¶¶ 15-16. Plaintiff has been on medications, including insulin since his diagnosis. FAC ¶ 16. Plaintiff also suffers from mental health issues, including depression and was diagnosed as bi-polar while incarcerated in the San Diego Central Jail ("SDCJ"). *Id*. Plaintiff's physical and mental health issues cause him to easily become confused, defensive, agitated, frustrated and to exhibit stress, fear, anxiety, and paranoia. FAC ¶ 17.

On May 17, 2021, Plaintiff was experiencing a severe medical emergency related to his health issues and Plaintiff's girlfriend made an emergency call for help. FAC ¶¶ 18-19. Emergency services, including the San Diego Fire Department ("SDFD") and San Diego Police Department ("SDPD") officers, Sgt. McGrath and Ofc. Reda arrived on the scene at or around 6:44 p.m. FAC ¶¶ 18, 23. When Sgt. McGrath and Ofc. Reda arrived, Plaintiff was unconscious, unresponsive, and laying face-down on the bedroom floor. FAC ¶ 20. Ofc. Reda believed Plaintiff was having a seizure. *Id*. Sgt. McGrath "violently grabbed Plaintiff's leg and continually tried to wake Plaintiff up by aggressively yanking his body across the bedroom." FAC ¶ 21. Sgt. McGrath became "frustrated as Plaintiff began to become conscious … [and] threw Plaintiff's body into a desk located in Plaintiff's bedroom." FAC ¶ 22. Sgt. McGrath and Ofc. Reda incorrectly assumed Plaintiff was under the influence of an illegal substance and treated him with a lesser standard of care. FAC ¶ 23.

After regaining consciousness, Plaintiff was confused, disoriented and unaware of his surroundings. FAC ¶ 24. Plaintiff paced around his house and the surrounding area outside of his house and his speech was confused and incoherent at times. FAC ¶ 25. "It was obvious Plaintiff was now suffering from either a mental health crisis or a medical emergency attributed to his diabetes." *Id*. Plaintiff voluntarily agreed to go to the hospital and was escorted to the back of an ambulance and strapped into a gurney. FAC ¶ 27.

Plaintiff was in the back of the ambulance and was noticeably still confused by what was going on and requested that Sgt. McGrath and Ofc. Reda vacate the area surrounding the ambulance. FAC ¶ 29. Sgt. McGrath and Ofc. Reda refused Plaintiff's multiple requests and Sgt. McGrath began to encroach on Plaintiff while he was strapped into the gurney in the ambulance. FAC ¶ 30. Plaintiff was confused and unstrapped himself from the gurney as Plaintiff believed Sgt. McGrath was making hostile aggressive behavior toward him. FAC ¶ 31. Ofc. Reda then raised his taser gun and shouted, "I'm going to [expletive] tase you!" FAC ¶ 32. Ofc. Reda did not provide any verbal warning that failure to sit down in the ambulance would result in being shot with less-lethal force. *Id*. Sgt. McGrath then grabbed Plaintiff with his hands and Ofc. Reda discharged his taser into Plaintiff's left leg. FAC ¶ 33. Sgt. McGrath wrestled Plaintiff to the ground, where Sgt. McGrath, Ofc. Reda, the Fire Department, and at least five people in total, placed their entire body weight with their knees on Plaintiff's upper back/neck, lower back/spine and extremities. FAC ¶ 34. Plaintiff rived in pain, shouting at the top of his lungs in distress, yelling for help from his mom and girlfriend who were nearby. FAC ¶ 36. Plaintiff eventually cooperated by allowing officers to handcuff him. FAC ¶ 37. Officers then placed Plaintiff in a WRAP restraining device where his legs were bound together with his arms restrained behind his back, leaving Plaintiff in a lock L-shaped sitting position. FAC ¶ 38. Plaintiff was then injected with 10 mg of Versed, a sedative, while he was restrained in the WRAP restraining device. FAC ¶ 39. Plaintiff suffered extensive bruising and abrasions all over his body. FAC ¶ 40.

3

Plaintiff was read his Miranda rights and interviewed, then arrested for a felony violation of California Penal Code § 245(c), assault of a police officer. FAC ¶¶ 41, 42. Plaintiff was transported to the University of California, San Diego Hospital ("UCSD") emergency room to be evaluated for potential injuries. FAC ¶ 47. UCSD Emergency Department notes indicated that Plaintiff had a history of Type-1 diabetes. FAC ¶ 49. Around 10:58 p.m., Plaintiff's blood sugar had dropped below the normal range and UCSD medical staff administered glucose to Plaintiff. FAC ¶ 50. Around 11:20 p.m., Plaintiff's blood sugar rose to a level within normal range and around May 18, 2021, at 12:29 a.m., he was eventually discharged from UCSD emergency department and cleared for booking. FAC ¶¶ 51, 52. Plaintiff's after visit summary provided instructions that "[p]atient medically cleared for transport and incarceration. While incarcerated[,] patient will require evaluation by Psychiatry due to potential for manic episode." FAC ¶ 53. The summary also included language about Plaintiff's blood sugar and administration of glucose. *Id*. On May 18, 2021, at 12:51 a.m., Plaintiff was booked into SDCJ. FAC ¶ 54.

SDCJ placed Plaintiff into a sobering cell upon his arrival and Plaintiff was diagnosed by jail staff as bi-polar and suffering from a physical disability. FAC ¶ 55. SDPD officers indicated in their intake report that Plaintiff was under the influence of a substance, but no drug test or psychiatric evaluation was done to determine whether placing Plaintiff into a sobering cell was appropriate. FAC ¶ 56. Progress notes from SDCJ's medical staff indicated that they were aware of Plaintiff's Type-1 diabetes. FAC ¶ 59. The National Commission on Correctional Health Care (NCCHC) Technical Assistance Report indicates that it is SDCJ's custom and policy to provide inmates, with diabetes, a nightly diabetic check-up at 2:00 a.m. FAC ¶ 60. Employees and medical staff at SDCJ did not follow the customs and policies established. FAC ¶ 61. There is no documentation of Plaintiff's blood sugar being checked at 2:00 a.m. while he was in a sobering cell and there is no documentation that he was checked every thirty minutes. *Id*. Plaintiff was later found unconscious and unresponsive on the morning of May 18, 2021, around 9:00 a.m. and his blood sugar was not checked until 9:12 a.m. that morning. FAC

¶ 62. At that time, Plaintiff's blood sugar was 589 mg/dL; a normal range for an adult is 70-99 mg/dL. FAC ¶ 63. SDCJ provided Plaintiff a minimum dosage of insulin at that time, to decrease his blood sugar. *Id*. While in custody, Plaintiff's blood sugar was checked on May 18, 2021, at 9:43 a.m., 10:28 a.m., 12:18 p.m., 1:44 p.m., 8:20 p.m., and 8:42 p.m. FAC ¶ 64. Plaintiff's blood sugar levels during each check was well over the normal range, as much as 3-5 times over, between 279-545 mb/dL. *Id*. SDCJ did not provide further insulin to Plaintiff throughout the day of May 18, 2021, until his transfer to UCSD. FAC ¶ 65. There is no documentation on his last blood sugar levels before he was transported to the hospital. *Id*.

The Emergency room referral prepared by SDCJ indicated that Plaintiff vomited multiple times and had an altered level of consciousness due to suffering from Hyper/Hypoglycemia. FAC ¶ 66. On or around May 19, 2021, at 12:11 a.m., SDCJ transferred Plaintiff by ambulance to UCSD for medical treatment. FAC ¶ 67. On or around May 19, 2021, at 12:41 a.m., Plaintiff arrived at UCSD's emergency department for medical treatment. FAC ¶ 68. During transportation to UCSD, EMS took Plaintiff's blood sugar, which was measured at 530 mg/dL. *Id*. Plaintiff was covered in his own vomit when he arrived at UCSD. *Id*. The initial emergency department provider notes from Dr. Sharika Kumari Sheth stated that Plaintiff was presenting with hyperglycemia, was sweating heavily (diaphoretic), and was vomiting. *Id*. Plaintiff's blood sugar at or around the time of admission to the UCSD emergency department was 400 mg/dL. *Id*. Plaintiff was admitted to the intensive care unit of UCSD for Diabetic Ketoacidosis ("DKA"). FAC ¶ 69. DKA is a potentially life-threatening complication of diabetes; signs and symptoms include vomiting, abdominal pain, deep gasping breathing, increased urination, weakness, confusion and occasionally loss of consciousness. *Id*. DKA is typically diagnosed when testing finds high blood sugar, low blood pH and ketoacids in either the blood or urine. *Id*. Plaintiff's symptoms eventually resolved after two days at UCSD. FAC ¶ 71. On or around May 21, 2021, Plaintiff was discharged from UCSD. FAC ¶ 72.

Plaintiff included various allegations regarding the customs and policies of San Diego County at SDCJ over the last several years. FAC ¶¶ 73-149. There were reports of the deaths of sixty inmates in SDCJ in a span of five years. FAC ¶ 76. A local newspaper, Citybeat, reported that San Diego County had the highest mortality rate among California's largest jail systems based on data from 2007 to 2012. *Id*. Citybeat reported that between 2007 to 2012, San Diego County averaged ten deaths a year, with a high of twelve in 2009 and a low of eight in both 2007 and 2012. FAC ¶ 77. In a follow-up article, Citybeat reported that twelve people died in 2013 and sixteen people died in 2014. FAC ¶ 78.

Plaintiff then mentions the deaths of inmates Jeff Dewall (2008) and Tommy Tucker (2009) at the hands of jail deputies due to oxygen deprivation when guards attempted to restrain them. FAC ¶ 80. Between 2007 and 2012, there were eight deaths in San Diego's jails that were drug-related, either overdoses or physical complications due to withdrawal. FAC ¶ 81. Richard Diaz, died from a stomach obstruction after three days of seizures and vomiting due to heroin withdrawal. *Id*. Adrian Correa died by suicide in 2008. FAC ¶ 82. Daniel Sisson died from an acute asthma attack made worse by drug withdrawal. FAC ¶ 87. Bernard Victorianne died from a drug overdose after suffering for five days because the staff ignored his medical information that he had ingested a baggie of methamphetamine, and that he was to return to the hospital immediately if he became symptomatic of overdose. FAC ¶ 88. Victorianne was placed in segregation instead of medical and the staff failed to input critical medical information in the JIMS system, and failed to communicate with each other Victorianne's medical alerts which required that the staff report symptoms of overdose and take him immediately to the hospital. *Id*. In the FAC, in support of his *Monell* claim, Plaintiff states "Defendant COUNTY condoned and acquiesced in the abusive behavior of its subordinates by refusing to retrain them, discipline them, or correct their abusive behaviors. The County ratified the actions of the individual defendants by failing to take any action after Omar's death." FAC ¶ 244.

Plaintiff alleges seven causes of action: (1) Deliberate Indifference under the Fourteenth Amendment in violation of 42 U.S.C. § 1983 against County Defendants; (2) Failure to Provide Timely Restorative Treatment under the Fourteenth Amendment in violation of 42 U.S.C. § 1983 against County Defendants; (3) Failure to Properly Train its staff in violation of 42 U.S.C. § 1983 against County Defendants; (4) Failure to Properly Supervise and Discipline staff in violation of 42 U.S.C. § 1983 against County Defendants; (5) *Monell* liability in violation of 42 U.S.C. § 1983 against the County; (6) Excessive Force in violation of 42 U.S.C. § 1983 against Sgt. McGrath and Ofc. Reda; and (7) *Monell* liability in violation of 42 U.S.C. § 1983 against the City.

**B. Footage From Body Worn Camera Video**

City Defendants submitted three exhibits to be considered as part of their motion to dismiss: (1) Ofc. Reda's body worn camera video ("BWC") taken during the incident; (2) a post-Miranda audio interview of Plaintiff; and (3) a transcript of both ("Ex. 3"). ECF No. 13. Plaintiff filed an objection to City Defendants motion requesting the Court take judicial notice of the BWC, but the objection did not address the other two exhibits. The Court will address the request for judicial notice and the objection below. The BWC provides a fuller picture of what happened.

When SDFD and SDPD personnel arrived at Plaintiff's residence, they found him unconscious, unresponsive, and lying face down on the floor, wedged between the bed and the dresser of his bedroom. BWC at 02:44. Sgt. McGrath pulled Plaintiff by his legs to get out of the very narrow area where he was found. BWC at 02:47. There was a desk and chair next to the dresser near where Sgt. McGrath was standing as he pulled Plaintiff by his legs. BWC at 02:47. As he was being pulled out of the narrow area, Plaintiff's left leg bumped into the chair, causing it to move backwards and his left arm bumped into the desk, causing it to move. BWC at 02:50. Sgt. McGrath then pushed the desk out of the path of the walkway next to the bed. BWC at 02:54. As Plaintiff became conscious, both officers explained to Plaintiff that they were there to help him because his girlfriend called for medical assistance. BWC at 03:02; Ex. 3 at 3:25-4:1-2. Sgt. McGrath then

3:23-cv-00898-JES-BLM

asked Plaintiff several times if he was okay and whether he normally had seizures. BWC at 03:14; Ex. 3 at 4:3-22. After clearing the residence of a dog, both officers then walked out of the home while paramedics entered the residence and treated Plaintiff. BWC at 04:15.

Plaintiff was disoriented and acted strangely, he walked out of the home, walked down the street and attempted to enter a SDFD fire truck. BWC at 10:55-12:47. Plaintiff eventually agreed to go to the hospital. BWC at 12:48; Ex. 3 at 15:20-16:3. Because of Plaintiff's strange and aggressive behavior, paramedics requested an officer to ride in the back of the ambulance. BWC at 13:28-13:49, 15:38-15:46; Ex. 3 at 17:10-18:7, 21:3-8. While inside of the ambulance, Plaintiff became extremely aggressive towards emergency personnel and threatened violence. BWC 16:20-17:29; Ex. 3 at 22:2-23:9. Plaintiff then unbuckled his seatbelt and told Ofc. Reda, "I'm gonna beat the fuck out of you." BWC at 17:32; Ex. 3 at 23:9-12. Ofc. Reda backed away and pulled out his taser. BWC at 17:36. In response, Plaintiff stated, "Yeah, you're going to taser me, you fucking little pussy," as he began exiting the back of the ambulance. BWC at 17:43; Ex. 3 at 23:14-16. Ofc. Reda then warned Plaintiff, "I'm gonna fucking taser you if you fucking come over here bro." BWC at 17:44; Ex. 3 at 23:17-18. Sgt. McGrath got between Plaintiff and Ofc. Reda and put his hands up trying to stop Plaintiff as he was stepping down from the back of the ambulance advancing towards Ofc. Reda, while a paramedic tried to pull Plaintiff back from inside of the ambulance. BWC 17:45. Plaintiff stepped down from the ambulance, struck Sgt. McGrath in the face with his left elbow and then Ofc. Reda discharged his taser at Plaintiff's left leg. BWC at 17:46. Plaintiff was taken to the ground by Sgt. McGrath and struggled for several minutes, as both officers and several paramedics held him down while the officers attempted to place him in handcuffs and prevent him from struggling. BWC at 17:48-18:30. While being held on the ground, Plaintiff was very aggressive and threatened to kill the officers several times, stating, "I'm fucking killing you." BWC at 18:31-20:10; Ex. 3 at 24:4-28:5. Eventually

3:23-cv-00898-JES-BLM

paramedics medically sedated Plaintiff and he was placed in a max restraint device and transported to a hospital for medical clearance for jail. BWC 23:41, 25:40, 29:00.

## II.    LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim tests the legal sufficiency of a plaintiff's claim. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). When considering the motion, the court must accept as true all well-pleaded factual allegations in the complaint. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The court need not accept as true legal conclusions cast as factual allegations. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient).

A complaint must "state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. To survive a motion to dismiss, a complaint must include non-conclusory factual content. *Id.* at 555; *Iqbal*, 556 U.S. at 679. The facts and the reasonable inferences drawn from those facts must show a plausible—not just a possible—claim for relief. *Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. at 679; *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009). The focus is on the complaint, as opposed to any new facts alleged in, for example, the opposition to a defendant's motion to dismiss. *See Schneider v. California Dep't of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998), *reversed and remanded on other grounds as stated in* 345 F.3d 716 (9th Cir. 2003). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The "mere possibility of misconduct" or "unadorned, the defendant-unlawfully-harmed me accusation[s]" fall short of meeting this plausibility standard. *Id.*; *see also Moss*, 572 F.3d at 969.

"[W]hen a plaintiff has claims against an unknown defendant, the plaintiff must still meet federal pleading standards when alleging facts against such defendants" in federal court. *Lomeli v. County of San Diego*, 637 F.Supp. 3d 1046, 1058 (S.D. Cal.

2022). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs "may refer to unknown defendants as 'Does'" at the pleading stage but Rule 8 nevertheless requires a plaintiff to "'allege specific facts showing how each particular doe defendant violated'" the plaintiff's rights. *Thomas ex rel. Thomas v. County of San Diego*, No. 20-cv-1979-CAB-MDD, 2021 WL 2715086, at *3 (S.D. Cal. July 1, 2021) (quoting *Keavney v. County of San Diego*, No. 19-cv-1947-AJB-BGS, 2020 WL 4192286, at *4 (S.D. Cal. July 21, 2020)); *see also Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988) (plaintiff "must set forth specific facts as to each individual defendant's" wrongdoing). A district court should dismiss claims against Doe defendants in a section 1983 suit when the complaint does not "even minimally explain how any of the unidentified parties … personally caused a violation of [the claimant's] constitutional rights." *Estate of Serna v. County of San Diego*, No. 20cv2096-LAB-MSB, 2022 WL 827123, at *3 (S.D. Cal. Mar. 18, 2022).

When a court dismisses a complaint under Rule 12(b)(6), it must then decide whether to grant leave to amend. Federal Rule 15(a) provides that a district court should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a). A district court has discretion to deny leave to amend when a proposed amendment would be futile. *Chappel v. Lab. Corp. of America*, 232 F.3d 719, 725-26 (9th Cir. 2000). Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies of the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003). In other words, if allowing a party to amend its pleading would be futile, district courts properly decline to grant leave to amend. *Thinket Ink Info. Res., Inc. v. Sun Microsys., Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004) (citing *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991)).

**B. Federal Rule of Civil Procedure 12(e)**

"A party may move for a more definite statement of a pleading … which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). An order granting the motion is appropriate when the responding party cannot

ascertain the substance of the asserted claim. *Buckley v. County of San Mateo*, No. 14-cv-05448-YGR, 2015 WL 5769616, at *5 (N.D. Cal. Oct. 2, 2015). "Rule 12(e) motions are disfavored and rarely granted." *Id.* (citing *Castaneda v. Burger King Corp.*, 597 F.Supp.2d 1035, 1045 (N.D. Cal. 2009)).

"The rule is aimed at unintelligibility rather than lack of detail and is only appropriate when the defendants cannot understand the substance of the claim asserted." *Id.* "[A] motion for a more definite statement should not be granted unless the defendant literally cannot frame a responsive pleading." *Conta v. City of Huntington Beach*, No. 8:21-cv-01897-JLS-KES, 2022 WL 3574439, at *2 (C.D. Cal. June 22, 2022) (citation omitted).

So-called "shotgun pleadings" may be considered unintelligible. Shotgun pleadings are generally characterized as "pleadings that overwhelm defendants with an unclear mass of allegations and make it difficult or impossible for defendants to make informed responses to the plaintiff allegations." *Sollberger v. Wachovia Sec., LLC*, No. SACV 09-0766 AG (ANx), 2010 WL 2674456, at *4 (C.D. Cal. June 30, 2010). "[P]laintiffs must give the defendants a clear statement about what the defendants allegedly did wrong." *Id.* One common type of shotgun pleading occurs in cases with multiple defendants where a plaintiff uses the omnibus term "Defendants" throughout a complaint by grouping defendants together "without identifying what the particular defendants specifically did wrong." *Id.* Another type is where the plaintiff recites a collection of general allegations toward the beginning of the Complaint, and then "each count incorporates every antecedent allegation by reference." *Id.* (citations omitted)

### III. LEGAL ANALYSIS

#### A. Motion to Seal

Courts have historically recognized a "general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 & n.7 (1978). "Unless a particular court record is one 'traditionally kept secret,' a 'strong presumption in favor of access' is the starting point."

*Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)). To overcome this strong presumption, a party seeking to seal a judicial record must articulate justifications for sealing that outweigh the public policies favoring disclosure. *See Kamakana*, 447 F.3d at 1178-79. In turn, the court must "conscientiously balance[] the competing interests of the public and the party who seeks to keep certain judicial records secret." *Id.* at 1179 (quoting *Foltz*, 331 F.3d at 1135) (internal quotation marks omitted).

"After considering these interests, if the court decides to seal certain judicial records, it must 'base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture.'" *Id.* (quoting *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995)). However, where the material is, at most, "tangentially related" to the merits of the case, the request to seal may be granted on a showing of "good cause." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016).

Here, City Defendants assert that good cause and compelling reasons exist to seal Exhibits 1-3 filed in support of their motion to dismiss. ECF No. 13. City Defendants argue the exhibits should be received under seal because they contain privileged official information "acquired in confidence by a police officer in the course of his duty," and reveals the officers' "identities and their badge numbers." ECF No. 13-1 at 3. Further, the Court notes that Plaintiff's girlfriend and mother are featured in the BWC and provide medical information concerning Plaintiff that is recorded on the BWC. Plaintiff does not oppose this motion.

The Court agrees with City Defendants and finds that despite the generally recognized right to inspect records and documents in this country, City Defendants have overcome this strong presumption of access. Furthermore, the exhibits to be sealed also contain confidential information regarding City Defendants and their identities. Accordingly, the Court finds that release of this information to the public could potentially embarrass or injure Plaintiff, his family, and Defendants. *See Covert v. City of*

3:23-cv-00898-JES-BLM

*San Diego*, No. 15cv2097 AJB (WVG), 2017 WL 1094020, at *4 (S.D. Cal. Mar. 23, 2017). Therefore, the City Defendants' motion to seal is **GRANTED**.

## B. Request for Judicial Notice

The City Defendants request the Court take judicial notice of (1) the BWC from Ofc. Reda, attached as Exhibit 1 to the Declaration of Blair McGregor in support of Defendants' motion to dismiss; (2) the Mirandized audio interview of Plaintiff ("audio interview"), which is attached as Exhibit 2 to the Declaration of Blair McGregor in support of Defendants' motion to dismiss; and (3) a transcript of both the BWC and the audio interview ("Ex. 3").

Plaintiff filed an objection to the request to take judicial notice of the BWC. In his objection, Plaintiff cites *Polnac v. City of Sulphur Springs*, 555 F.Supp.3d 309 (E.D. Tex. 2021) as being instructive on the issue. Plaintiff did not object to the transcript of the BWC or the audio interview. Further, Plaintiff incorporated the BWC into the FAC.

Federal Rule of Evidence 201 provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2).

Generally, material beyond the pleadings may not be considered in deciding a Rule 12(b)(6) motion. However, a court may properly look beyond the complaint to matters of public record, and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment. *Lihosit v. Flam*, No. CV-15-01224-PHX-NVW, 2016 WL 2865870, at *3 (D. Arizona May 16, 2016) (citation omitted). A court may also look to documents on which the complaint necessarily relies, if their authenticity is not contested. *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013).

Here, Plaintiff incorporated the BWC and statements from the audio interview into the FAC. Further, although Plaintiff objects to the City Defendants request to take judicial notice of the BWC, neither in his objection nor at oral argument did Plaintiff question the authenticity of the BWC, the audio interview or the transcripts. Further,

Plaintiff's reliance on *Polnac* is misguided as courts in this district have regularly considered BWC in support of a motion dismiss. *See Lihosit*, 2016 WL 2865870, at *3; *see also Covert*, 2017 WL 1094020, at *5. Therefore, the Court considers the BWC, the audio interview and the transcripts of both in deciding the present motion, and this consideration does not convert the motion to one for summary judgment. The request for judicial notice is **GRANTED**.

## C. County Defendants' Motion

Plaintiff's first, second, third, fourth, and fifth causes of action allege *Monell* liability against the County and liability against Sheriff Gore, Sheriff Martinez, and Doe defendants in their personal capacities. County Defendants argue that Plaintiff has failed to allege a cause of action as to all claims against the individual defendants and the County. Further, the County alleges that Plaintiff has failed to allege any individual participation by Sheriff Gore or Sheriff Martinez. The County clarifies that Sheriff Martinez was not even in office at the time of the alleged conduct and was sworn into office on December 16, 2022, one and one-half years after the alleged conduct. Alternatively, if dismissal is not granted, County Defendants argue that Plaintiff's complaint includes shotgun pleadings, and that Plaintiff should be required to file a more definite statement omitting shotgun allegations.

### 1. Counts 1, 3, 4: Individual Capacity Claims

Title 42 U.S.C. § 1983 provides a cause of action for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States. To state a claim under section 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law. *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). Liability under section 1983 must be based on the personal involvement of the defendant. *May v. Enomoto*, 633 F.2d 164, 167 (9th Cir. 1980).

A defendant may be held liable as a supervisor under section 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). "The inquiry into causation must be individualized to focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer*, 844 F.2d at 633; *see also Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). "[A] plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury. The requisite causal connection can be established … by setting in motion a series of acts by others, or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr*, 652 F.3d at 1207-08 (internal citations omitted) (quoting *Dubner v. City & County of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (citations omitted).

Supervisory officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. Rather, a plaintiff must establish that each individual "[g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Id. See also Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); *see also Robertson v. Sichel,* 127 U.S. 507, 515–516, (1888) ("A public officer or agent is not responsible for the misfeasances or positive wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is

15

inapplicable to section 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. *See Iqbal*, 556 U.S. at 676.

Plaintiff does not clarify this issue, but it appears that Plaintiff is asserting causes of action against Sheriff Gore and Sheriff Martinez in both their official capacity and individual capacity. When individuals being sued in their official capacity as municipal officials and the municipal entity itself are being sued, then the claims against the individuals are duplicative and should be dismissed. *Vance v. County of Santa Clara*, 928 F.Supp. 993, 996 (N.D. Cal. 1996). To the extent the individual County Defendants are being sued in their official capacity, all claims are **DISMISSED with prejudice**.

### a. Sheriff Martinez

According to the FAC, the incident giving rise to this case occurred on May 17, 2021. FAC ¶ 18. The County argues that Sheriff Martinez was not sworn into office until December 16, 2022, over one year after the events in this case. ECF No. 11-1 at 10. In his opposition, Plaintiff did not respond to the County's arguments regarding Sheriff Martinez and only included a one-line reference, "[t]o the extent that Martinez has any involvement, Martinez can be said to still allow these deficiencies to continue." ECF No. 18 at 8. First, Plaintiff's response calls for the court to speculate about Sheriff Martinez' involvement in Plaintiff's alleged constitutional violations. Second, it appears that Plaintiff is attempting to argue that Sheriff Martinez can be a party to this case if she continued to allow certain policies and procedures after her ascent to Sheriff. Plaintiff cites no legal authority to support his argument. Plaintiff's argument is entirely speculative and conclusory and cannot support a cause of action against Sheriff Martinez for any of the alleged claims. Plaintiff asks for leave to amend to correct any deficiencies in his pleading, however, there are no facts consistent with the challenged pleading that could possibly cure the deficiency. *See Jackson*, 353 F.3d at 758. Therefore, all claims alleged against Sheriff Martinez are **DISMISSED with prejudice**.

/ / /

### b. Sheriff Gore

The County argues that the first, third and fourth causes of action conflate municipal and individual liability theories by attempting to state a claim under 42 U.S.C. § 1983 against Sheriff Gore, Sheriff Martinez and Doe Defendants individually as "policymaking authorities" with no allegations of their specific individual participation. ECF No. 11-1 at 10.

Plaintiff argues that there is a pattern and history of constitutional violations from the County regarding its jails that span over two decades and that failure to train and supervise extends to Sheriff Gore as the violations were so pervasive that the policymakers were on constructive notice of the constitutional violations. ECF No. 18 at 8. Further, Plaintiff argues that as a policymaker, Sheriff Gore "was fully aware of the inadequacies at SDCJ [and] … would presumptively have knowledge that his employees were inadequately trained and were deliberately indifferent to their prisoner's needs." *Id*.

In the FAC, Plaintiff makes several conclusory allegations against Sheriff Gore:

"Despite well-known problems of deaths and serious injuries from improper monitoring of inmates and failure to render adequate medical care, GORE … continued to cover up their subordinates' misconduct." FAC ¶ 107.

"Defendant Gore knew that his subordinates were failing to communicate critical medical information to each other. He knew that countless people died as a result of the failure to transmit critical information and that patients were being denied basic medical care." FAC ¶ 200.

"Defendant GORE knew that his deputies were consistently failing to conduct proper cell checks, leading to numerous death and serious injuries. Defendant GORE knew that his housing deputies were failing to place patients and inmates in proper housing units where they could be monitored for their serious medical needs. Other inmates improperly placed in temporary housing cells had died as a direct result of the failure to place them in medical units in order to monitor them. Despite this knowledge, Defendant GORE failed to train his staff." FAC ¶ 201.

Based on these conclusory statements, Plaintiff's allegations amount to an argument to support a theory of respondeat superior or vicarious liability.

3:23-cv-00898-JES-BLM

Plaintiff does not allege that Sheriff Gore personally violated his constitutional rights. In his opposition, Plaintiff cites no legal authority to support his argument that Sheriff Gore is individually liable for the alleged constitutional violation. Plaintiff responds with a conclusory argument that Sheriff Gore "would presumptively have knowledge that his employees were inadequately trained and were deliberately indifferent to their prisoner's needs." ECF No. 18 at 8. Further, Plaintiff argues that "San Diego County Jails are the deadliest jails in this state and Gore has failed to provide any adequate remedy to address this situation." *Id*. Plaintiff makes these conclusory allegations without actually alleging what specific actions Sheriff Gore took in this case. The allegations about Sheriff Gore failing to properly train or supervise his staff are nothing more than conclusory allegations that fail to state a plausible claim for relief, especially considering that there are no facts pled to show that Sheriff Gore trained any of the staff members involved in the medical care Plaintiff received while in custody.

The FAC fails to allege sufficient facts to indicate any direct participation by Sheriff Gore. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. *See Cavanaugh v. County of San Diego*, No.: 3:18-cv-02557-BEN-LL, 2020 WL 6703592, at *29 (S.D. Cal. Nov. 12, 2020) (Conclusory allegations that "'[t]he acts and/or omissions of Sheriff [Gore] were a proximate cause of [Plaintiff]'s death' without actually alleging what the acts of Sheriff Gore were. … do not create a plausible claim for relief"). Further, Plaintiff has not alleged sufficient facts to establish a causal connection that Sheriff Gore set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury. Therefore, the individual capacity claims against Sheriff Gore are **DISMISSED without prejudice**.

### c. Doe Defendants

The Court notes that the FAC includes allegations against Does 1 through 20. A section 1983 action must allege how each individual defendant directly participated in the violation of Plaintiff's rights. If Plaintiff seeks to hold any of the Doe Defendants liable

under a theory of supervisory liability or failure to train, Plaintiff fails to allege sufficient facts to support a plausible Fourteenth Amendment claim against any Doe Defendant based on their supervisory roles. "A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr*, 652 F.3d at 1207 (quoting *Hansen*, 885 F.2d at 646). Plaintiff does not allege such facts in his Complaint.

Plaintiff must allege with some degree of particularity overt acts in which Doe Defendants engaged. *Jones v. Cmty. Redev. Agency of Los Angeles*, 733 F.2d 646, 651 (9th Cir. 1984). Further, Plaintiff must allege that an individual committed acts that resulted in the violation of his constitutional rights, not a facility. Accordingly, Plaintiff's Fourteenth Amendment claim arising out of the purported failure to train, supervise, or discipline unknown jail staff fails and is **DISMISSED without prejudice** against Doe Defendants.

### (1) Count 5 *Monell* Claim Against Doe Defendants

The Court notes, *sua sponte*, that the FAC also includes allegations against Does 1 through 20 in count 5, which asserts *Monell* liability. Municipal liability does not extend to individuals, *Monell* claims only lie against municipalities; therefore, Plaintiffs' may not bring a *Monell* claim against Doe Defendants. *See Monell*, 436 U.S. at 690-91 (applies only with respect to suits brought against "municipalities and other local government units,"); *see also Guillory v. Orange County*, 731 F.2d 1379, 1382 (9th Cir. 1984) ("*Monell* does not concern liability of individuals acting under color of state law."); *see also Machado v. California Dep't of Corr. & Rehabilitation*, No. 12-cv-6501-JSC, 2013 WL 5800380, at *4 (N.D. Cal. Oct. 28, 2013) (dismissing *Monell* claim without leave to amend as "neither Defendant CDCR nor Defendants Cate and Lewis can be said to be acting as a municipality."). Therefore, the *Monell* claim in count 5 against Does 1 through 20 is **DISMISSED with prejudice**.

/ / /

3:23-cv-00898-JES-BLM

## 2. Count 2 – Timely Restorative Treatment

The County argues that the second cause of action fails to allege sufficient facts to support the claim that the County and Sheriff Gore refused to provide Plaintiff with timely restorative treatment. ECF No. 11-1 at 12. Further, the County argues that Plaintiff cannot allege that he was civilly committed for his mental condition, nor that he was indefinitely held on criminal charges because he was mentally unfit to stand trial. ECF No. 11-1 at 13. In addition, the County argues that Plaintiff cannot allege he was held in jail for "weeks or months," or that timely restorative treatment could benefit people with lifelong afflictions such as type-1 diabetes or bi-polar disorder. ECF No. 11-1 at 13-14. Plaintiff does not address the County's argument at all in their opposition.

"The Supreme Court has recognized that an individual has a liberty interest in being free from incarceration absent a criminal conviction." *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003) (citations omitted). "Incapacitated criminal defendants have liberty interests in freedom from incarceration and in restorative treatment." *Id*. "[C]ivilly committed persons must be provided with mental health treatment that gives them 'a realistic opportunity to be cured or improve the mental condition for which they were confined.'" *Id.* (quoting *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000) (citing *Ohlinger v. Watson*, 652 F.2d 775, 779 (9th Cir. 1980). "Whether the substantive due process rights of incapacitated criminal defendants have been violated must be determined by balancing their liberty interest in freedom from incarceration and in restorative treatment against the legitimate interests of the state." *Mink*, 322 F.3d at 1121 (citing *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)). "[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Mink*, 322 F.3d at 1122 (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)).

Plaintiff does not dispute any of the legal arguments raised in Defendant's motion. By failing to address this issue, Plaintiff concedes it. *See Walsh v. Nevada Dep't of Human Resources*, 471 F.3d 1033, 1037 (9th Cir. 2006) (holding plaintiff who failed to

3:23-cv-00898-JES-BLM

address issues raised in defendant's motion in his opposition brief "has effectively abandoned his claim, and cannot raise it on appeal"); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F.Supp.2d 1125, 1132 (C.D. Cal. 2011) ("[F]ailure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue."); *Lee v. Summit Tr. Servs., LLC*, No. CV 19-3814-DMG (Ex), 2020 WL 1249971, at *3 (C.D. Cal. Jan. 22, 2020) (granting motion to dismiss because plaintiff's opposition "[did] not address Defendants' arguments to dismiss" and thus "conceded that those claims should be dismissed"). Plaintiff asks for leave to amend to correct any deficiencies in his pleading, however, there are no facts consistent with the challenged pleading that could possibly cure the deficiency. *See Jackson*, 353 F.3d at 758. Therefore, the second cause of action is **DISMISSED with prejudice**.

### 3. Counts 1, 3, 4, 5: *Monell* Claims

Plaintiff appears to argue *Monell* liability against the County in counts 1, 3, 4 and 5. In count 1, Plaintiff alleges *Monell* liability against the County under a theory of deliberate indifference to a serious medical need; in count 3 under a failure to train theory; in count 4 under a failure to supervise theory; and in count 5 appearing to allege deliberate indifference to a serious medical need, failure to train and failure to supervise. FAC ¶¶ 228-246. Counts 1, 3 and 4 against the County are duplicative of count 5 and are **DISMISSED with prejudice**.

In order to establish liability for governmental entities under *Monell*, a plaintiff must prove "(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v. Sch. Dist. No. 40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)).

3:23-cv-00898-JES-BLM

A plaintiff can satisfy *Monell*'s policy requirement in one of three ways; (1) a local government may be held liable when it acts "pursuant to an expressly adopted official policy;" (2) a public entity may be held liable for a "longstanding practice or custom;" or (3) "a local government may be held liable under [section] 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Gordon v. County of Orange*, 6 F.4th 961, 973-74 (9th Cir. 2021) (citations omitted).

The County argues that Plaintiff has failed to allege an unconstitutional policy, either official or unofficial, in the FAC to establish *Monell* liability. ECF No. 11-1 at 11-12. Specifically, the County argues that the FAC does not identify any other instance involving jail inmates with diabetic complications. ECF No. 11-1 at 12. Further, the County argues that the claim for failure to train and failure to supervise fail because Plaintiff did not identify any other instance in which jail personnel implemented policies or protocols related to handling diabetic complications or treatment. ECF No. 11-1 at 14. Additionally, the County argues that jail personnel may be entitled to qualified immunity if Plaintiff alleges that he was required to have a blood sugar check every thirty minutes or a right to direct-view safety checks. ECF No. 11-1 at 12.

In his opposition, for the first time, Plaintiff cites an unnamed policy and alleges that the policy is the "relevant policy regarding diabetics presenting with similar symptoms as Plaintiff." ECF No. 18 at 5. Plaintiff then goes on to argue that the County violated said policy. *Id*. Plaintiff also for the first time states the County Standard Nursing Procedures ("SNPs") fail to take certain factors into account when determining the number of times a patient's glucose levels should be checked. ECF No. 18 at 6. Plaintiff then argues the County's failure to adequately provide the needed medical care to a patient gives rise to constitutional violations. ECF No. 18 at 6. Further, Plaintiff argues that the County's diabetes policy was inadequate. *Id*. Additionally, Plaintiff argues that the National Commission on Correctional Health Care (NCCHC) Technical Assistance

Report indicates that SDCJ has a custom and policy to provide inmates, with diabetes, a nightly check-up at 2:00 a.m. and that SDCJ does not have a program for a chronic disease other than hypertension. ECF No. 18 at 7. Plaintiff then argues that the County does not have a standard policy for diabetes care. *Id*. Plaintiff then argues about the requirements of Section II(C) of the SNP Treatment Plan. *Id*.

Plaintiff never included the County's diabetes policy in the FAC, nor how the individual Defendants or jail personnel either failed to follow said policy or were not adequately trained or supervised. Further, Plaintiff did not allege any requirements of the SNP Treatment Plan in the FAC. The Court cannot consider the Plaintiff's arguments regarding the stated policy in his opposition or the SNP policy as both were outside of the pleadings. The Court can only consider evidence which falls under certain exceptions to the general rule that "matters outside of the pleadings cannot be considered." *Sommer v. United States*, No. 09cv2093 WQH (WMc), 2010 WL 3584554, at *8 (S.D. Cal. Sept. 10, 2010). Plaintiff does not identify any exceptions which would allow the Court to consider the stated policy in his opposition or the SNP policy. As such, count 5 is **DISMISSED without prejudice**.

### a. Shotgun Pleadings

The FAC is littered with "shotgun pleadings." Plaintiff alleges deliberate indifference to serious medical needs, failure to train and failure to supervise, yet makes several claims in the FAC that have nothing to do with the causes of action alleged. For example:

> "Inmates Jeff Dewall (2008) and Tommy Tucker (2009) died at the hands of jail deputies due to oxygen deprivation when guards attempted to restrain them." FAC ¶ 80.

> "In 2014, Hector Lleras told jail staff that he was suicidal. He was placed in a safety cell for a day. Twenty-four hours after he was released from a safety cell, he hanged himself." FAC ¶ 91.

> "In 2014, Christopher Carroll, who was mentally ill, was placed in segregation. He was found dead with a noose around his neck. Mr. Carroll had smeared blood on

the wall of his cell. He had urinated on the floor and food and feces were stuck to the ceiling." FAC ¶ 92.

"In 2018, four inmates committed suicide in the Jails." FAC ¶ 103.

"On or around December 17, 2017, several months before this incident, George Bryan fell off the top bunk of his cell at the Central Jail, seriously injuring himself." FAC ¶ 104.

"There had been multiple instances of inmates falling off of the top bunks at the San Diego Jails resulting in injuries, many of them serious." FAC ¶ 105.

"Defendant COUNTY condoned and acquiesced in the abusive behavior of its subordinates by refusing to retrain them, discipline them, or correct their abusive behaviors. The County ratified the actions of the individual defendants by failing to take any action after Omar's death." FAC ¶ 244.

Plaintiff did not mention any information about the death of "Omar" prior to this one reference yet seeks to invoke *Monell* liability against the County because of the death of "Omar." These allegations of excessive force, suicide and falling off the top bunks don't appear to have any bearing whatsoever on the causes of actions alleged. They appear to be shotgun allegations.

Further, Plaintiff makes several conclusory and frankly confusing allegations. For example, Plaintiff alleges:

"SDCJ placed Plaintiff into a sobering cell upon his arrival." FAC ¶ 55.

"[T]here is no documentation to support that SDCJ followed the customs and policies that were required of them." FAC ¶ 61.

"Plaintiff's blood sugar that morning was 589 mg/dL; a normal range for an adult person is 70-98 mg/dL. SDCJ provided Plaintiff a minimum dosage of insulin, at this time, to decrease his blood sugar." FAC ¶ 63.

"SDCJ documented that Plaintiff was checked on May 18, 2021, at 9:43 a.m.; 10:28 a.m.; 12:18 p.m.; 1:44 p..; 8:20 p.m.; and 8:42 p.m." FAC ¶ 64.

"SDCJ did not provide further insulin to Plaintiff throughout the day of May 18, 2021, until his transfer to UCSD." FAC ¶ 65.

"The Emergency Room Referral prepared by SDCJ indicated that Plaintiff vomited multiple times and had an altered level of consciousness due to suffering from Hyper/Hypoglycemia." FAC ¶ 66.

Plaintiff ascribes these actions to "SDCJ," but earlier in the FAC he defines "SDCJ" as the San Diego Central Jail. FAC ¶ 2.

In the first, third, fourth and fifth causes of action, Plaintiff realleges and incorporates the prior allegations by reference and then groups all defendants together without identifying what each particular defendant did wrong. *Sollberger*, 2010 WL 2674456, at *4. This manner of pleading are examples of shotgun pleadings. County Defendants motion for a more definite statement is **GRANTED** regarding the first and fifth causes of action.

### D. City Defendant's Motion – Sixth and Seventh Causes of Action

City Defendants argue that Plaintiff has failed to allege that Sgt. McGrath used excessive force when he grabbed Plaintiff's legs and pulled him from his wedged-in position next to his bed. Further, City Defendants argue that Plaintiff has failed to allege that Ofc. Reda used excessive force when deploying his taser on Plaintiff. As such, City Defendants argue that Plaintiff has failed to allege a violation of a constitutional right and the officers are entitled to qualified immunity. Additionally, City Defendants argue that Plaintiff has failed to allege *Monell* liability since there was no violation of a constitutional right. The Court agrees with each argument.

In the sixth cause of action, Plaintiff alleges excessive force by Sgt. McGrath and Ofc. Reda. Specifically, Plaintiff alleges that Sgt. McGrath threw his legs into a desk while rendering aid. Further, Plaintiff alleges that Ofc. Reda tased him without justification or legal cause and without warning.

### 1. Qualified Immunity

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or

3:23-cv-00898-JES-BLM

constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," and "[w]hen properly applied, [] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity attaches when an official's conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curiam*)

Claims of qualified immunity require the court to consider two questions: (1) whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the defendant's conduct violated a constitutional right, and (2) whether the right was clearly established—that is, whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201-202 (2001). Courts may exercise discretion in deciding which prong to address first. *Pearson*, 555 U.S. at 236. The absence of either element warrants a finding that immunity exists. *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017).

"Plaintiffs bear the burden of proving that a constitutional right 'was clearly established at the time of the incident.'" *Benavidez*, 993 F.3d at 1151 (citation omitted). But, at the pleading stage, the Court resolves the question of qualified immunity "drawing all inferences in [the plaintiff's] favor." *Ballou v. McElvain*, 29 F.4th 413, 421 (9th Cir. 2022). "If the operative complaint 'contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right,' then plaintiffs are 'entitled to go forward' with their claims." *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) (citation omitted). However, "[a] heightened pleading standard … appl[ies] in this circuit in section 1983 cases where the defendant is entitled to assert the qualified immunity defense and where her or his knowledge or intent is an element of the plaintiff's constitutional tort." *Lee*, 250 F.3d 668 at 679 n.6.

### a. Excessive Force Claim Against Sgt. McGrath

Plaintiff alleges that Sgt. McGrath "[u]nprovoked, and without consent … violently grabbed Plaintiff's leg and continually tried to wake Plaintiff up by aggressively yanking his body across the bedroom. McGrath became frustrated as Plaintiff began to become conscious … then threw Plaintiff's body into a desk located in Plaintiff's bedroom." FAC ¶¶ 21, 22. The City argues that Plaintiff was suffering a medical emergency and Sgt. McGrath pulled him from a wedged-in position next to his bed. ECF No. 12-1 at 11. The City also argues that the allegation that Sgt. McGrath threw Plaintiff's legs into a desk is not supported by the BWC or as a reasonable inference. *Id*. The City further argues that Sgt. McGrath was attempting to render aid during an emergency and did not assault Plaintiff. *Id*.

### (1) Whether A Constitutional Right Was Violated

Traditionally, courts evaluate an excessive force claim under an objective reasonable test of whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Graham v. Connor*, 490 U.S. 386, 397 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. The Fourth Amendment permits law enforcement to use "objectively reasonable" force. *Graham*, 490 U.S. at 396-97. Factors for evaluating reasonableness include but are not limited to: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officer or others; and (3) whether the suspect actively resisted arrest or attempted to escape. *Id*. at 396.

However, the *Graham* test only applies when the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen. *Id*. at 395. The claim of excessive force against Sgt. McGrath was not in relation to an arrest or investigatory stop.

As noted in Defendant's motion, there is no Ninth Circuit authority regarding a finding of excessive force against an officer moving an unconscious person to render aid.

3:23-cv-00898-JES-BLM

Defendant cites *Williamson v. City of National City*, 23 F.4th 1146, 1152 (9th Cir. 2022) as a dissimilar analogue in which the Court held that physically lifting and pulling limp protestors from city council chambers did not constitute excessive force, even though it resulted in a torn rotator cuff and sprained wrist. *Id*.

Defendant cites as persuasive authority *Wiley v. City of Columbus*, 545 F.Supp.3d 567 (S.D. Ohio 2021), a Sixth Circuit case. In *Wiley*, the Court examined a claim of excessive force in the medical emergency context and noted that "where the *Graham* test does not fit, 'because the person in question has not committed a crime, is not resisting arrest, and is not directly threatening the officer,' the Sixth Circuit required that a 'more tailored set of factors be considered in the medical-emergency context." *Id*. at 577. The Sixth Circuit has stated that in the medical emergency context, the Court should ask: "(1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others? (2) Was some degree of force reasonably necessary to ameliorate the immediate threat? (3) Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)? 'If the answers to the first two questions are 'yes,' and the answer to the third questions is 'no,' then the officer is entitled to qualified immunity.'" *Id*. (quoting *Estate of Hill v. Miracle*, 853 F.3d 306, 314 (6th Cir. 2017). The Court finds the authority persuasive and will apply it to the facts of the present case.

Here, officers received a call that Plaintiff was "experiencing a severe medical emergency." FAC ¶ 18. When officers arrived at the home, Plaintiff was "unconscious, unresponsive, and laying face-down on the bedroom floor," wedged between the bed and the wall. FAC ¶ 20. Plaintiff's girlfriend told officers that Plaintiff was experiencing a seizure. Sgt. McGrath then pulled Plaintiff by his legs away from the narrow wedged-in area where he was located. Plaintiff's allegations that Ofc. McGrath threw his legs into a desk are not supported by the BWC. Although the Court must accept all allegations in the complaint as true, the Court is not required to accept as true allegations that contradict

3:23-cv-00898-JES-BLM

matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). In asking the above questions from the test outlined in *Estate of Hill*, the answer to the first two questions is yes, Plaintiff was experiencing a medical emergency that rendered him incapable of making a rational decision that posed an immediate threat of serious harm to himself, and some degree of force was reasonably necessary to ameliorate the immediate threat. Plaintiff was wedged-in between a very tight space, face down, suffering a seizure according to Plaintiff's girlfriend. Officers needed to assist Plaintiff to prevent serious harm. Regarding the third question, the force used was reasonably necessary under the circumstances and not excessive. Therefore, Plaintiff's constitutional rights were not violated.

### (2) Whether the Constitutional Right Was Clearly Established

Assuming arguendo, that Plaintiff's constitutional rights were violated, the right was not clearly established. As previously noted, Plaintiff bears the burden to show that the constitutional right was clearly established at the time of the incident. In his opposition, Plaintiff argues that "[i]t is not necessary for the alleged acts to have been held unconstitutional previously, as long as the unlawfulness was apparent in light of existing law.' ECF 19 at 6. Plaintiff then cites *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (2003) to support his argument that "a reasonable officer would have had fair notice that dragging an unresponsive party across the floor and then throwing them into a desk was excessive under the circumstances." ECF 19 at 6. As the Court noted previously, the allegation that Sgt. McGrath threw Plaintiff into a desk is not supported by the BWC. Nonetheless, Plaintiff did not discuss how factually the *Drummond* case would give fair notice to law enforcement officers that a right is clearly established.

In *Drummond*, officers while attempting to take the decedent into custody for his own safety, knocked the decedent to the ground, cuffed his arms behind his back, put their knees into the decedent's back and one officer placed the weight of their body on

3:23-cv-00898-JES-BLM

the decedent's back and another on the decedent's neck. *Drummond*, 343 F.3d at 1054. The decedent fell into respiratory distress and repeatedly told the officers that he could not breathe and that they were choking him. *Id*. The Ninth Circuit reversed the District Court's grant of qualified immunity based on the significant level of force used, finding that the use of only minimal force would be appropriate. *Id*. at 1058.

To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Court "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Here, Sgt. McGrath pulled Defendant, who was believed to be unconscious and suffering from a seizure, by his legs from a wedged-in area to ensure that paramedics could provide emergency medical treatment. The force used was minimal at best. Given the factual disparity, *Drummond* would not put a reasonable officer on fair notice that his actions were unlawful. Therefore, Sgt. McGrath is entitled to qualified immunity. The excessive force claim against Sgt. McGrath is **DISMISSED with prejudice**.

### b.  Excessive Force Claim Against Ofc. Reda

Plaintiff alleges that Ofc. Reda used excessive force when deploying a taser on Plaintiff without justification or legal cause and without warning. The City argues that Ofc. Reda had legal cause to deploy his taser and properly warned Plaintiff prior to deploying the taser.

### (1) Whether a Constitutional Right Was Violated

In addition to the *Graham* factors discussed above, other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed. *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011). Of all these factors, the "most important" one is "whether

3:23-cv-00898-JES-BLM

the suspect posed an immediate threat to the safety of the officers or others." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (internal citations omitted)). The Court must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

Using the *Graham* factors and viewing the evidence in the light most favorable to the Plaintiff, it is undisputed that Plaintiff had been acting strangely and aggressively towards paramedics and officers. Because of his aggressive behavior, paramedics requested an officer to ride in the back of the ambulance. Plaintiff then became extremely aggressive, unbuckled his seatbelt and told Ofc. Reda, "I'm gonna beat the fuck out of you." BWC at 17:32. Ofc. Reda then backed away and pulled out his taser. BWC at 17:36. In response to seeing the taser, Plaintiff stated to Ofc. Reda, "Yeah, you're going to taser me, you fucking little pussy," as he began to exit the back of the ambulance. BWC at 17:43. Ofc. Reda then warned Plaintiff, "I'm going to fucking taser you if you fucking come over here bro." BWC at 17:44. Sgt. McGrath then got between Plaintiff and Ofc. Reda with his hands up to deescalate the situation as Plaintiff was advancing towards Ofc. Reda. BWC at 17:45. Plaintiff stepped down from the ambulance and struck Sgt. McGrath in the face with his left elbow and only after that, did Ofc. Reda deploy his taser. BWC at 17:46. It is undisputed from the video that Plaintiff posed an immediate threat to the safety of Ofc. Reda and Sgt. McGrath prior to the deployment of the taser. Further, it's clear that Plaintiff used violence against Sgt. McGrath prior to the deployment of the taser. Additionally, Ofc. Reda gave a clear warning that Plaintiff would be tased if he continued to aggressively approach Ofc. Reda after threatening violence against Ofc. Reda. Under these facts, Ofc. Reda's deployment of the taser was objectively reasonable. Plaintiff's constitutional rights were not violated.

**(2) Whether the Constitutional Right Was Clearly Established**

Assuming arguendo, that Plaintiff's constitutional rights were violated, the right was not clearly established. As previously noted, Plaintiff bears the burden to show that the constitutional right was clearly established at the time of the incident. In his opposition, Plaintiff once again argues that "[i]t is not necessary for the alleged acts to have been held unconstitutional previously, as long as the unlawfulness was apparent in light of existing law.' ECF 19 at 6. Plaintiff then once again cites *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (2003) to support his argument that "a reasonable officer would have had fair notice that … deploying a taser without de-escalating the situation," was excessive under the circumstances. ECF 19 at 6. The Court previously discussed the facts of the *Drummond* case and nothing in that case would give fair notice to law enforcement officers that a right is clearly established. As stated above, Plaintiff bears the burden of proving that a constitutional right was clearly established at the time of the incident. *See Benavidez*, 993 F.3d at 1151. Plaintiff fails to argue factually similar cases. Therefore, the constitutional right was not clearly established and the excessive force claim against Ofc. Reda is **DISMISSED with prejudice**.

**2. Seventh Cause of Action**

The City's motion is directed to Plaintiff's *Monell* claim. On Plaintiff's *Monell* claim, the City argues it is entitled to dismissal of this claim for several reasons. First, it asserts that Sgt. McGrath and Ofc. Reda did not violate Plaintiff's constitutional rights and are entitled to qualified immunity. Second, the City contends in the alternative that if there was a violation of a constitutional right, Plaintiff failed to properly allege a failure to train claim, by not pleading any facts alleging any particular deficiency in the City's police officer training program. Third, the City asserts Plaintiff has failed to identify a formal policy or longstanding custom or practice. To the extent Plaintiffs have cited a policy, custom or practice, the City argues Plaintiff has failed to allege any policy, custom or practice caused any violation of Plaintiff's constitutional rights. Finally, the

3:23-cv-00898-JES-BLM

City asserts Plaintiff has failed to set forth sufficient facts to support a *Monell* claim showing the City was the moving force behind Plaintiff's alleged injuries.

As stated above, in order to establish liability for governmental entities under *Monell*, a plaintiff must prove "(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v. Sch. Dist. No. 40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)).

Plaintiff argues that allegations set forth in paragraphs 264-268 of the FAC sufficiently support an inference that the City's conduct conformed to a municipal policy of condoning and ratifying its officers' excessive use of force. ECF No. 19 at 8. However, paragraphs 264-268 simply state the element for an excessive force claim in general terms but does not provide notice of any specific actions that the officers or the City has taken or failed to take in light of prior incidents of excessive force. In fact, Plaintiff does not mention a single prior incident of excessive force that put the City on notice of a failure to train its officers. Plaintiff's allegations are conclusory and insufficient to support a cause of action for *Monell* liability. Further, as mentioned above, there was no violation of Plaintiff's constitutional rights. Therefore, the *Monell* claim against the City is **DISMISSED with prejudice**.

## IV.   CONCLUSION

For the reasons set forth above, the Court:

1. **GRANTS** the City's motion to seal Exhibits 1-3;

2. **GRANTS** the City's request for judicial notice of Exhibits 1-3;

3. **GRANTS** the County's motion to dismiss with prejudice all claims against Sheriff Gore and Sheriff Martinez in their official capacity;

4. **GRANTS** the County's motion to dismiss with prejudice all claims against Sheriff Martinez;

5. **GRANTS** the County's motion to dismiss the individual capacity claim against Sheriff Gore;

6. **GRANTS** *sua* sponte to dismiss with prejudice *Monell* claims against Doe Defendants;

7. **GRANTS** the County's motion to dismiss with prejudice the second cause of action against all Defendants;

8. **GRANTS** the County's motion to dismiss with prejudice the *Monell* claims in counts one, three and four as duplicative of count five;

9. **GRANTS** the County's motion to dismiss the *Monell* claim against the County;

10. **GRANTS** the County's motion for a more definitive statement in regards to the first and fifth causes of action;

11. **GRANTS** the City's motion to dismiss with prejudice the excessive force claims against Sgt. McGrath and Ofc. Reda in count six; and

12. **GRANTS** the City's motion to dismiss with prejudice the *Monell* claim against the City in count seven.

Plaintiff has **30 days** from the date of this order to file a second amended complaint with a more definite statement and curing the defects in the claims dismissed without prejudice.

**IT IS SO ORDERED**.

Dated:  July 22, 2024

_____

Honorable James E. Simmons Jr.
United States District Judge